**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
ALICE KENNY,

Plaintiff,

-against-

CATHOLIC CHARITIES COMMUNITY SERVICES,
ARCHDIOCESE OF NEW YORK; KEVIN SULLIVAN;
PAUL COSTILGIO; and JOY JASPER,

Defendants.
-----------------------------------------------------------------------x

**AMENDED COMPLAINT**

20 Civ. 3269 (PAE) (RWL)

**JURY TRIAL DEMANDED**

PLAINTIFF ALICE KENNY, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, amends her Complaint and alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

<u>NATURE OF THE ACTION</u>

1.      Plaintiff was employed as Director of Special Projects – Communications and Marketing Department for Defendant Catholic Charities Community Services, Archdiocese of New York ("Catholic Charities") and brings this action for sex discrimination, age discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, <u>et seq.</u> ("Title VII"), the New York State Human Rights Law, New York Executive Law §§ 290, <u>et seq.</u> ("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code §§ 8-101, <u>et seq.</u> ("NYCHRL").

<u>THE PARTIES</u>

2.      Plaintiff, Alice Kenny, is a female resident of Brevard County, Florida.

1

3.     Defendant Catholic Charities Community Services, Archdiocese of New York ("Catholic Charities") is a domestic not-for-profit corporation organized and existing under the laws of the State of New York with a principal place of business at 1011 First Avenue, New York, New York 10022.

4.     At all times relevant, Defendant Catholic Charities was Plaintiff's employer within the meaning of Title VII, NYSHRL, and NYCHRL.

5.     Plaintiff worked at Catholic Charities' office in New York, New York at all times relevant.

6.     Defendant Kevin Sullivan ("Defendant Sullivan") is the Executive Director and the highest-ranking employee at Defendant Catholic Charities. Defendant Sullivan had the ability to affect the terms and conditions of Plaintiff's employment and is an employer under the NYSHRL and NYCHRL.

7.     Defendant Paul Costiglio ("Defendant Costiglio") was the Director of Communications at Defendant Catholic Charities. Defendant Costiglio had the ability to affect the terms and conditions of Plaintiff's employment and is an employer under the NYSHRL and NYCHRL.

8.     Defendant Joy Jasper ("Defendant Jasper") is the Director of Human Resources at Defendant Catholic Charities. Defendant Jasper had the ability to affect the terms and conditions of Plaintiff's employment and is an employer under the NYSHRL and NYCHRL.

## JURISDICTION

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1332 and § 1367 for civil actions arising under the laws of the United States, diversity jurisdiction and supplemental jurisdiction.

10.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations under Title VII and received a Right to Sue Letter dated January 28, 2020.

## VENUE

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in the Southern District of New York.

## FACTUAL BACKGROUND

### Plaintiff Was Well Qualified For And Immediately Excelled In Her Position

12.     Plaintiff was hired as a Writer/Editor by Defendants on January 1, 2004 on a part-time basis.

13.     Plaintiff was an independent contractor in her role as Writer/Editor.

14.     When Defendants hired Plaintiff as an independent contractor on a part-time basis, Plaintiff had been working as a freelance reporter/writer for local newspapers since 1995 and as a freelance reporter/writer for the New York Times since approximately 2002 and continued freelancing for them for several years while employed by Defendants.

15.     Upon information and belief, Catholic Charities recognized what an asset Plaintiff was to the not-for-profit, and promoted her to a part-time staff position, as opposed to an independent contractor, as the Director of Special Projects – Communications and Marketing Department on October 27, 2008.

16.     In her new role, Plaintiff was primarily responsible for directing the "Neediest Cases" program. Plaintiff would supervise staff and teach them what type of articles qualified as a "Neediest Case" article. Neediest Case articles were articles that focused on individual stories and the articles often involved translating experiences within social work into stories which could

3

be published. After developed, Plaintiff would then reach out to outside publications, such as the New York Times, and pitch the story to an editor at the publication, typically The New York Times, with the goal of having the publication work with Defendant on behalf of Catholic Charities to publish the story. After the story was published in an outside publication, Plaintiff would be responsible for continuing to investigate and interview individuals and use those interviews to create synopsis of the stories to support Catholic Charities fundraising efforts. In approximately 2011, Plaintiff began posting these stories and the synopses' she created on Catholic Charities blog, again, in an effort to fundraise. Plaintiff had complete control over what stories the staff in her department focused on and what went onto the blog once the stories had been published by outside publishers.

17.     Plaintiff was particularly well-suited for this role because of her extensive connections with outside publications, including The New York Times.

18.     After starting her role, Plaintiff immediately increased Defendants' published stories by 400%.

19.     Once Plaintiff was hired as a staff employee, she was able to drastically increase funding by bringing Catholic Charities from last place within The New York Times' The Neediest Cases Campaign, to first place. If Catholic Charities were to have remained in last place, it would have meant that Defendants were at risk of losing a significant amount of funding from the program and its major story source for publicity, which would result in even more of a funding loss.

20.     Many larger and better funded organizations competed within the The New York Times' The Neediest Cases Fund and despite other organizations having more resources to support their competition in the fund than Defendants, Plaintiff was able to maintain Defendants' first place position for over a decade.

21.     Plaintiff was able to move Defendants from last place to first place and keep Defendants in first place because of her individual reporting, writing, directing, and interpersonal skills with The New York Times staff and Defendants' agency heads, case workers, and clients.

22.     Specifically, Plaintiff's success with The New York Times' The Neediest Cases Fund resulted in Defendants increasing the funding they received from $544,437 in May 2018 to almost a 50% increase of $815,852 in May 2019. On information and belief, The New York Times' The Neediest Cases Fund received fewer donations in 2019, yet Plaintiff was able to increase Defendants' funding award from the previous year despite the lack of donations to the fund. Meanwhile, on information and belief, several competing agencies saw their funding decrease due to their lack of success getting The New York Times to publish their stories.

23.     As director, reporter, and writer of Defendant Catholic Charities' blog, Plaintiff increased readership by hundreds of percentage points each quarter since 2015, which is when Defendants started recording readership statistics. Plaintiff was able to accomplish this by using her experience to create innovative strategies, finding and writing stories, taking photos, and editing the blog posts after online input was received, and employing website optimization techniques prior to final publication.

24.     Plaintiff's success in increasing the blog's readership brought the blog from having 1,800 unique visits per quarter in 2015 to 29,937 unique visits per quarter over the next three years, an increase of 1285% by 2018.

25.     On information and belief, social media platforms managed by other staff members were declining in readership at the same time the blog Plaintiff ran was increasing.

26.     Plaintiff received multiple honors from agencies affiliated with Defendants, including being asked to be the keynote speaker for Elinor Martin Residence for Mother & Child's annual gala in 2016 and a Certificate of Appreciate awarded by the Grace Institute in 2018.

27.     Prior to her wrongful constructive discharge, Plaintiff's last performance review, given in 2010 by her supervisor, stated that she was "an asset, high performer, professional easy with getting the job done and done very well." Plaintiff's supervisor continued that Plaintiff "[s]hould have exec[utive]and supervisory responsibilities for written and spoken communications in additional to current responsibilities." Upon information and belief, Plaintiff's supervisor at the time, Jacelyn Lofaro, believed she was being under-utilized by Defendants.

28.     In approximately January 2016, Plaintiff became a full-time employee.

**Defendants Create A Hostile Work Environment Which Discriminates Against Women**

29.     When Plaintiff began working for Defendants, she was immediately made aware of Defendant Sullivan's discriminatory actions and preferences regarding his employees.

30.     Defendant Sullivan began in his role as Executive Director, the highest-ranking employee of Defendant Catholic Charities, in 2001.

31.     Defendant Sullivan repeatedly and openly expressed, through comments and actions, his preference for physical attractiveness over professional capabilities.

32.     Defendant Sullivan states on his blog that two things interest him: flowing church vestments and singer Jennifer Lopez's "scant stage attire." Defendant Sullivan expressed his admiration for scantily clad pop singers by posting a full-size cutout of the singer Beyonce in a provocative outfit in his glass-walled office.

33.     Defendant Sullivan's preference for young, attractive women was so prevalent that it was an open and common joke within the office.

34.     Defendant Sullivan's Executive Secretary at the time would refer to the various women who Defendant Sullivan expressed sexual interest in his "flavor of the month," because he so frequently changed his clearly displayed interest in women he deemed attractive.

35.     On information and belief, Defendant Sullivan does not believe that Plaintiff fits his definition of physical attraction for a woman, and therefore he subjected her to gender and age discrimination throughout the tenure of her employment with Defendants.

36.     As the Executive Director, Defendant Sullivan has created a work atmosphere that allows women to be judged on their perceived physical attraction and treated differently in the terms and conditions of their employment based on that judgment.

### Plaintiff Complains of Sexual Harassment and Discrimination

37.     Frederick Joseph, a marketing manager, ("Manager Joseph") who was hired in mid-2015 followed Defendant Sullivan's gender discrimination by openly reviewing and directing all women in the office, including those who were not his subordinates such as Plaintiff. Manager Joseph also used this atmosphere to flirt with female employees and comment on women's appearance in the office. For example, at one point Manager Joseph commented that other people at a work event were looking at Plaintiff and him as though they were a couple.

38.     After being exposed to Manager Joseph's continued sexual harassment, Plaintiff and other female coworkers complained about his harassment to Defendants in late 2016, specifically Defendant Jasper. After an investigation, Defendants allowed Manager Joseph to resign. After Manager Joseph's resignation, Defendant Costiglio underwent supervisory training for allowing Manager Joseph's sexual harassment to continue for so long.

39.     On information and belief, while Plaintiff and her coworkers did not complain specifically about Defendant Costiglio's conduct, Defendant Jasper included him in the complaint

because as the supervisor, he should not have allowed Manager Joseph's sexual harassment. On information and belief Defendant Costiglio did not stop Manager Joseph because he supported the general gender-hostile office atmosphere and Defendant Sullivan's preference for young, attractive women.

40.     Plaintiff specifically did not complain of Defendant Costiglio's or Defendant Sullivan's discrimination because she was certain that she would lose her position if she did so.

**<u>Defendants Retaliate Against Plaintiff for Her Complaint</u>**

41.     After Plaintiff complained of gender discrimination and sexual harassment, Defendants began to retaliate against her.

42.     After Plaintiff's complaint, Defendant Sullivan continued to and escalated his discrimination and retaliation of Plaintiff and treated younger women who he deemed sexually attractive and men better than plaintiff.

43.     In January 2017, only a couple months after she complained about sexual harassment and gender discrimination, Defendants moved Plaintiff from her office to a small desk in the hallway. While the entire department moved floors at that time, the men and young women who Defendant Sullivan deemed attractive were each given two large desks, some in the common work area, some for the first time in offices, as opposed to Plaintiff's single small desk in the hallway. Plaintiff was the only employee put at a single small desk in a hallway.

44.     On information and believe the other women who complained about discrimination found new employment because they understood that the gender-hostile work environment was not going to change at Catholic Charities.

45.     At this time, on information and belief, Plaintiff was the only staff employee within the department who was over 40 years old, except for Defendants Sullivan and Costiglio.

46.     Plaintiff was consistently excluded from meetings that  required her attendance to be most effective in her position from that point on. One example is in March 2019, the Board of Directors Marketing and Communications committee met and while Plaintiff's male and younger female coworkers were invited, Plaintiff was not.

47.     On information and belief, Defendants' discrimination against Plaintiff went so far that a leadership training program that took place in approximately February 2019,  was kept secret from Plaintiff and only offered to people under forty years old. On information and belief this was because Defendants only wanted employees under forty to advance in the organization. On information and belief, no one over forty years old was invited to attend the training. Plaintiff would not have known about this meeting except she had to stay late one day and saw that it was happening. On information and belief, there had been training meetings prior to February 2019, to which only men and women under 40 years old were invited.

48.      On information and belief, the employees who attended the meetings were afforded trainings and promotional opportunities which Defendants did not offer to Plaintiff.

49.     In 2018, Defendant Sullivan promoted a younger woman, Fanny Gomez, to a social media specialist position.  He promoted her to this position from a basically secretarial position within less than a year from hiring her. On information and belief, Defendant Sullivan promoted her because he found her sexually attractive. Defendant Sullivan spent large amounts of time at this employee's desk. Defendant Sullivan often praised her work, despite her having limited success in her position.

50.     On information and belief, while Ms. Gomez oversaw Defendants' social media, outside of the blog, viewership greatly declined on all social media except the blog, which Plaintiff oversaw.

**Defendants Effectively Demote Plaintiff In Further Retaliation For Her Complaint**

51.     In early 2019, Plaintiff began to notice that, despite years of having full authority over the blog, that her posts were being changed without her approval or even notice, which resulted in errors being published on the blog.

52.     On March 14, 2019, Defendants continued their retaliation by formally placing Plaintiff under the supervision of two men who had less experience than Plaintiff. John Mark De Palma and Zachary Davis, who had graduated college only one year prior, were given authority over Plaintiff. Suddenly, after having one year of experience in the field, Mr. Davis and Mr. De Palma, who had worked previously for smaller nonprofit organizations, were both to supervise Plaintiff and given the final authority over Plaintiff's writing product despite Plaintiff's extensive experience, strong writing prowess and website optimization success that had been shown over the course of her employment. Mr. De Palma, while holding a title equivalent to Plaintiff at the time he was assigned to supervisor her, was significantly less experienced writer/editor, and Mr. Davis actually had a lower title than Plaintiff and did mostly administrative work, yet was still given authority over her writing contributions.

53.     For years prior to March 14, 2019, Plaintiff had authority over her own blog posts, including topics, stories, writing, editing, online posting, and formatting. On March 14, 2019, Defendants locked Plaintiff out of the website on which she posted to the blog. Defendants then told Plaintiff that all of her posts had to go through Mr. De Palma and Mr. Davis.

54.     No other employees were put under the supervision of Mr. Davis and Mr. De Palma.

55.     On information and belief, Defendant Sullivan and Defendant Costiglio met several times in relation to promoting Mr. De Palma and Mr. Davis above Plaintiff prior to March 14, 2019.

56. Defendant Costiglio told Plaintiff that Mr. De Palma and Mr. Davis would be her final "touchpoint" on all blog posts.

57. On information and belief, Defendant Sullivan authorized, directed, and/or approved of Defendant Costiglio placing Mr. De Palma in a supervisory position over Plaintiff.

58. Defendant Costiglio further instructed Plaintiff that she was to prepare four news features each week that were to be determined by Mr. De Palma at weekly meetings, meaning she no longer had the authority to determine what stories she would work on even though she had been in charge of inhouse written stories posted on the website previously.

59. Plaintiff immediately complained to Defendant Costiglio about this disparate treatment on March 15, 2019.

60. Plaintiff complained, among other things, that her publications were being edited without her approval for months, that she was being treated differently than her peers, and that Defendants placing Mr. Davis and Mr. De Palma in positions of authority over Plaintiff diminished her position and was an adverse action.

61. Defendant Costiglio never acknowledged receipt of Plaintiff's complaint.

62. When Defendant Costilgio finally spoke with Plaintiff, it did not address her complaints of discrimination but rather nonsensically told her that Mr. De Palma and Mr. Davis were not being promoted, even though they now each had authority over Plaintiff.

63. Plaintiff continued to view this as an effective demotion of her position.

64. On March 25, 2019, Plaintiff complained to Human Resources regarding Defendant Costiglio effectively demoting Plaintiff and failed to respond to her March 15, 2021 complaint.

65. At this time, Plaintiff specifically complained that she had been discriminated and retaliated against because of her complaints; age and gender.

11

66.     Around this time period, Defendants also allowed Mr. Davis and Mr. De Palma to freely edit and change Plaintiff's writing without her consent, delete attributions to outside authors so the stories no longer made sense, illustrate a story about an individual with a photo of a different person, remove quotation marks to make it appear Catholic Charities got the quote from a client rather than the quote coming from a NY Times published interview/story, etc.  Similarly, on information and belief, Mr. De Palma would frequently take articles researched and written, by reporters in publications which had no relation to Catholic Charites, change them slightly and then publish them in association with Catholic Charities.

67.     Mr. De Palma would place his own name/byline on his now-paraphrased story, then create a new internet address for it as if it was a separate, newly reported story by him. This resulted in Google marking some published materials as duplicates of other work in a way meant to be deceptive and manipulative, and ultimately lead to Catholic Charities content being removed from Google's search results.

**Defendants Continue to Retaliate Against Plaintiff Following Her Second Complaint of Discrimination**

68.     After Plaintiff submitted her second complaint to Human Resources, her supervisors and coworkers began to shun and exclude her in retaliation for her complaint. On information and belief, Human Resources shared Plaintiff's complaint with several members of Defendants' staff.

69.     After her second complaint, Plaintiffs' coworkers excluded her from any casual conversations, stopped inviting her to informal lunches they regularly had together, walking together after work to the train station, etc.

70.     After her complaint, Defendant Costiglio largely ignored Plaintiff and on the few times he did interact with her, he was rude and abrupt towards Plaintiff.

71.     After Plaintiff complained to Human Resources, Defendant Sullivan excluded Plaintiff from outside events while including male coworkers and younger female coworkers who he deemed sexually attractive. For example, in April 2019, Defendant Sullivan did not invite Plaintiff to an event held by Mercy Center but invited her younger female coworkers who he deemed sexually attractive.

72.     Defendant Sullivan also excluded Plaintiff from board meetings focused on the Marketing Department – Plaintiff's department. In April 2019, Defendant Sullivan invited a young female employee, Ms. Gomez who, on information and belief, he deemed attractive, on a work trip to Central America. Ms. Gomez, in her capacity as social media specialist, wrote a number of 280-word tweets about the trip.  Defendant Sullivan had never before invited prior social media specialists to accompany him on trips, instead writing tweets himself or having others do so. Defendant Sullivan did not invite other employees who did have a business need, such as Plaintiff. Plaintiff should have been included on the Central America trip because it was her job to produce the longer content that Defendant Catholic Charities would publish related to the trip.

73.     Defendant Sullivan chose a younger woman who deemed attractive over Plaintiff, who was specifically supposed to publish information related to the trip. Plaintiff had to produce in-depth blog posts about the trip to be used for fundraising efforts without actually being on the trip. This was difficult, yet Plaintiff was able to complete this task and secure funding, as discussed above.

74.     The only other employee Defendant Sullivan took on the trip was another young woman who, on information and belief, Defendant Sullivan found attractive.

75.     During this time period, Defendant Sullivan would regularly sit at Ms. Gomez's desk and only speak to her within the department. He would see her exiting the elevator with fellow

staff and greet her alone. Catholic Charites Marketing Manager Sandy Strk ("Manager Strk") would frequently, publicly comment that Defendant Sullivan "only had eyes for [Ms. Gomez]."

76.    Defendant Sullivan also invited Ms. Gomez to several evening events, including a private holiday party at his home.

77.    Defendant Sullivan invited Ms. Gomez to work with him on a weekly radio program, "JustLove," which required individual meetings each week. The woman in this position prior, who on information and belief was not deemed attractive enough for Defendant Sullivan, was never asked to work on projects that required Defendant Sullivan and herself working alone together.

78.    After complaining about discrimination, Defendant Costilgio instructed Plaintiff to continue the work Mr. De Palma had been doing by taking her own and outside articles, modifying them and then posting them as if they were fresh content researched and written by Catholic Charities. Plaintiff objected, stating that it was dishonest and violated Google's standards and filed a third complaint with Defendant Jasper in Human Resources.

79.    On May 14, 2019, Defendant Jasper denied Plaintiff's complaints.

80.    On information and belief, Defendants did not properly investigate Plaintiff's claims of discrimination and retaliation.

81.    Prior to the denial, Plaintiff had been able to avoid modifying articles from outside entities pursuant to Defendants' requests, but now that her claim had been denied she was told in no uncertain terms that she needed to start this practice or be reprimanded for insubordination.

**Defendants Constructively Discharge Plaintiff's Employment**

82.    Defendants' discriminatory conduct and then denial of Plaintiff's complaints made Plaintiff feel incredibly upset, upset her stomach, and caused her to lose sleep. During the time

Defendants were supposed to be investigating her complaints, Plaintiff lost 10 pounds in just over one week due to stress caused by Defendants discriminatory actions.

83.     Due to the Defendants' failure to address her complaints of discrimination and retaliation and the fact that she would continue to be supervised by men with less experience, qualifications or demonstrated ability despite her significant contributions to Defendant Catholic Charities fundraising efforts over the years, Defendants constructively discharged Plaintiff.

84.     Defendants created a work environment that was so intolerable that Plaintiff, a reasonable person, could not longer work in her position and she resigned her employment.

85.     Defendants created such an intolerable and hostile environment, that Plaintiff had no choice but to resign from her employment.

86.     Defendants' behavior and creation of an intolerable and hostile environment resulted in Defendants constructively discharging Plaintiff's employment.

87.     On information and belief, after Plaintiff's repeated complaints, Defendant Catholic Charities encouraged Defendant Costiglio to resign because of his discriminatory actions, despite telling Plaintiff that they found her complaints without merit.

### AS AND FOR THE FIRST CAUSE OF ACTION
*(Gender and Sex Discrimination in Violation of Title VII Against Defendant Catholic Charities)*

88.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

89.     Defendant has discriminated against Plaintiff on the basis of her gender and sex in violation of Title VII. Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

90.     Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to severe and

pervasive harassment, a hostile work environment, discriminatory demotion, disparate terms and conditions of employment, and termination of employment on the basis of her sex.

91.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

92.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Retaliation in Violation of Title VII Against Defendant Catholic Charities)*

93.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

94.    Plaintiff repeatedly objected to and reported to Defendant about Defendant's discriminatory treatment of her.

95.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, demoting her position, preventing her from performing the duties of her position, and ultimately terminating her employment in violation of Title VII.

96.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

97.    As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

98.    By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

**AS AND FOR THE THIRD CAUSE OF ACTION**
*(Gender and Age Discrimination in Violation of the New York State Human Rights Law Against Defendants Catholic Charities, Sullivan and Costiglio)*

99.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

100.     Defendants have discriminated against Plaintiff on the basis of her gender and age in violation of the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* Plaintiff has suffered and disparate treatment as a result of Defendant's wrongful conduct.

101.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and younger employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory demotion, disparate terms and conditions of employment, and termination of employment on the basis of her sex and age.

102.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

103.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law.

104.     Plaintiff shall seek attorney's fees and punitive damages.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
*(Retaliation in Violation of the New York State Human Rights Law Against Defendants Catholic Charities, Sullivan and Costiglio)*

105.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

106.     Plaintiff repeatedly objected to and reported to Defendant about Defendant's

17

discriminatory treatment of her.

107.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, demoting her position, preventing her from performing the duties of her position, and ultimately terminating her employment in violation of the New York State Human Rights Law.

108.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

109.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

110.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law.

111.    Plaintiff shall seek attorney's fees and punitive damages.

**AS AND FOR THE FIFTH CAUSE OF ACTION**
*(Gender and Age Discrimination in Violation of the New York City Human Rights Law Against Defendants Catholic Charities, Sullivan and Costiglio)*

112.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

113.    Defendants have discriminated against Plaintiff on the basis of her gender and age in violation of the New York City Human Rights Law, the Administrative Code of the City of New York § 8-101, *et seq.*

114.    Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and younger employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory demotion, disparate terms

and conditions of employment, and termination of employment on the basis of her sex and age.

115.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

116.   By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law.

117.   Plaintiff shall seek attorney's fees and punitive damages.

**AS AND FOR THE SIXTH CAUSE OF ACTION**
*(Retaliation in Violation of the New York City Human Rights Law*
*Against Defendants Catholic Charities, Sullivan and Costiglio)*

118.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

119.   Plaintiff repeatedly objected to and reported to Defendant about Defendant's discriminatory treatment of her.

120.   In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, demoting her position, preventing her from performing the duties of her position, and ultimately terminating her employment in violation of the New York City Human Rights Law.

121.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

122.   As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

123.   By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law.

124.     Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Aiding and Abetting Discrimination and Retaliation under the NYSHRL Against Individual Defendants)*

125.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

126.     New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

127.     Individual Defendants aided and abetted the gender discrimination, age discrimination, and retaliation against Plaintiff.

128.     Defendant Catholic Charities have, and throughout Plaintiff's employment had, a continuous practice or policy of discouraging women from reporting gender and age, and failing to prevent or stop sexual harassment.

129.     Defendant Catholic Charities fosters, and throughout Plaintiff's employment fostered, an environment where women do not feel comfortable reporting gender and age discrimination.

130.     Defendant Catholic Charities has, and through Plaintiff's employment had, a continuous practice or policy of failing to properly investigate complaints of gender harassment and age discrimination.

131.     Defendant Catholic Charities has, and through Plaintiff's employment had, a continuous practice or policy of intimidating and/or ignoring employee witnesses to gender and age discrimination, including but not limited to making threats of adverse employment action should the employees speak out against said discrimination.

132.    The Individual Defendants aided and abetted the gender and age discrimination by,among other things, subjecting Plaintiff to said discrimination, allowing said discrimination tooccur, failing to investigate said discrimination, and by creating a hostile work environment that resulted in Plaintiff's constructive termination.

133.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

### AS AND FOR THE EIGHTH CAUSE OF ACTION
*(Aiding and Abetting Discrimination and Retaliation Under the NYCHRL Against Individual Defendants)*

134.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

135.    New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

136.    Individual Defendants aided and abetted the gender discrimination, age discrimination, and retaliation against Plaintiff.

137.    Defendant Catholic Charities have, and throughout Plaintiff's employment had, a continuous practice or policy of discouraging women from reporting gender and age, and failing to prevent or stop sexual harassment.

138.    Defendant Catholic Charities fosters, and throughout Plaintiff's employment fostered, an environment where women do not feel comfortable reporting gender and age discrimination.

139.    Defendant Catholic Charities has, and through Plaintiff's employment had, a

continuous practice or policy of failing to properly investigate complaints of gender harassment and age discrimination.

140.    Defendant Catholic Charities has, and through Plaintiff's employment had, a continuous practice or policy of intimidating and/or ignoring employee witnesses to gender and age discrimination, including but not limited to making threats of adverse employment action should the employees speak out against said discrimination.

141.    The Individual Defendants aided and abetted the gender and age discrimination by, among other things, subjecting Plaintiff to said discrimination, allowing said discrimination to occur, failing to investigate said discrimination, and by creating a hostile work environment that resulted in Plaintiff's constructive termination.

142.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

## <u>RELIEF</u>

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(a)    Declaring that by the acts and practices complained of herein, Defendants have violated Title VII, New York State Human Rights Law, and New York City Human Rights Law;

(b)    Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect Plaintiff's employment opportunities;

(c)     Directing Defendants to make Plaintiff whole for all earnings she would have received but for Defendants' discriminatory and retaliatory treatment, including but not limited to, lost wages, pension, and other benefits;

(d)     Directing Defendants to pay Plaintiff compensatory damages for her mental anguish, emotional distress, and humiliation;

(e)     Awarding Plaintiff punitive damages as relates to the malicious and willful conduct of Defendants;

(f)     Awarding Plaintiff pre- and post-judgment interest;

(g)     Awarding Plaintiff costs and reasonable attorneys' fees; and

(h)     Granting Plaintiff such other and further relief as this Court deems necessary and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury of all issues as of right by a jury.

Dated:  New York, NY
        April 16, 2021

                                        Respectfully submitted,

                                        GODDARD LAW PLLC
                                        *Attorney for Plaintiff*

                                        By:*/s/ Megan S. Goddard*
                                           Megan S. Goddard, Esq.
                                           Siobhan Klassen, Esq.
                                        39 Broadway, Suite 1540
                                        New York, NY 10006
                                        Office: 646-504-8363
                                        Fax: 212-473-8705
                                        megan@goddardlawnyc.com
                                        siobhan@goddardlawnyc.com