UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALICE KENNY,

                                    Plaintiff,

            -v-

CATHOLIC CHARITIES COMMUNITY SERVICES, THE
ARCHDIOCESE OF NEW YORK, *et al.*,

                                    Defendants.

---

20 Civ. 3269 (PAE) (RWL)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Alice Kenny brings this lawsuit against her former employer, Catholic Charities

Community Services ("Catholic Charities"), an agency of the Archdiocese of New York, and

three of its officers or employees, Monsignor Kevin Sullivan, Joy Jasper, and Paul Costiglio

(together and with Catholic Charities, "defendants").  Kenny alleges that she was subjected to

discrimination on the basis of her sex, and to a hostile work environment during her

employment, and was retaliated against for complaining about such conditions, in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended at 42 U.S.C. §§ 2000e *et seq*.

Kenny also brings claims of age and sex discrimination, a hostile work environment, and

retaliation against defendants, under the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law §§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code §§ 8-101 *et seq*.  Defendants now move for summary judgment on all claims.  For

the reasons that follow, the Court grants this motion as to Kenny's federal and NYSHRL claims,

and declines to exercise supplemental jurisdiction over Kenny's NYCHRL claims.

I.      **Background**

     A.      **Factual Background**[1]

         1.      **The Parties and Their Roles at Catholic Charities**

The Catholic Charities of the Archdiocese of New York (the "Federation") is a federation of approximately 90 independently incorporated, not-for-profit agencies. Pl. 56.1 ¶ 2. It provides a range of charitable services in the New York metropolitan area. JSF ¶ 2. Catholic Charities Community Services ("Catholic Charities") is one such agency. *Id.* Catholic Charities

---

[1] The Court draws the following facts from the parties' submissions in support of and in opposition to defendants' summary judgment motion. These include the following: (1) the parties' joint stipulation of undisputed facts ("JSF"), Dkt. 56; (2) in support of Catholic Charities' motion for summary judgment: its memorandum of law, Dkt. 60 ("Mem."); its Local Rule 56.1 statement, Dkt. 61 ("Def. 56.1"); the declarations, and attached exhibits, of Robert Tucker, Dkt. 62 ("Tucker Decl."), Monsignor Kevin Sullivan, Dkt. 63 ("Sullivan Decl."), Paul Costiglio, Dkt. 64 ("Costiglio Decl."), and Joy Jasper, Dkt. 65 ("Jasper Decl."); and its reply to Kenny's opposition to summary judgment, Dkt. 71 ("Reply"); and (3) in opposition to the motion, Kenny's memorandum of law, Dkt. 66 ("Opp."); her Local Rule 56.1 counterstatement, Dkt. 67 ("Pl. 56.1"); and the declaration of Siobhan Klassen, Dkt. 68 ("Klassen Decl."), and attached exhibits, which include excerpts from the depositions of Kenny, Jasper, Costiglio, non-party John-Mark de Palma, and Sullivan.

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Kenny does not dispute or otherwise address the assertions contained in paragraphs 1–9, 13–27, 52, 55–56, 58–61, 64, or 82–83 of Catholic Charities' Rule 56.1 statement. "[W]hile a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000)). Here, the Court has reviewed Catholic Charities' Rule 56.1 Statement and found a factual basis in admissible evidence for the assertions in the paragraphs listed above.

has a business service agreement with the Federation to share certain services.  *Id.* ¶ 3.  Sullivan has been chair of the Federation's board and executive director of Catholic Charities for more than 20 years.  *Id.* ¶ 4.  Jasper has worked as Catholic Charities' director of human resources since 2007.  *Id.* ¶ 5.  Costiglio was the Federation's director of communications and marketing between November 2013 and June 2019.  *Id.* ¶ 6.

In 2003, Kenny began working for the Federation as an independent contractor.  *Id.* ¶ 7. On August 24, 2005, she transitioned to work for the Federation part-time.  *Id.* ¶ 8.  On October 27, 2008, Kenny became the Federation's director of special projects in the communications and marketing department ("Marketing Department").  *Id.* ¶ 9.  On or about September 8, 2014, Kenny was transferred from the Federation to Catholic Charities, but the terms and conditions of her employment remained the same.  *Id.* ¶ 11.

The parties agree that Kenny's starting salary as director of special projects was $82,486.15 and that she initially worked 3.5 days weekly.  *Id.* ¶ 10.  Beginning in 2009 and continuing through the duration of her employment with Catholic Charities, Kenny's overall salary increased every year on approximately September 1 (although Kenny contends that her increased workload made the pay increases illusory).  *See* Klassen Decl., Ex. 1 ("Kenny Dep.") at 89; *id.*, Ex. 3 ("Costiglio Dep.") at 196.  From at least January 1, 2017 through the end of her employment with Catholic Charities, Kenny worked a 30-hour work week and received health insurance benefits.[2]  JSF ¶ 12.

Kenny also received and reviewed Catholic Charities' employee handbook.  *See* Jasper Decl., Ex A ("Handbook").  It includes policies prohibiting discrimination or harassment on the

---

[2] Kenny testified that she also participated in Catholic Charities' pension program.  *See* Kenny Dep. at 56.

basis of age or gender, *id.* at 15,[3] and retaliation against persons who report such misconduct, *id.* at 16. It also sets out a "Research and Literary Ownership" policy that provides, as relevant here, that "[a]ll written work product, as well as research with its documentation and processes created or performed by employees in the regular course of duties are the sole property of the Agency." *Id.* at 49; JSF ¶ 22.

### 2. Kenny's Role Within the Marketing Department

The record does not contain a written job description specific to the director of special projects position.[4] Kenny testified that "[she] didn't get new job descriptions that kept up with all the new job duties that [she] was given" and that her "job kept evolving" while she worked at Catholic Charities. Kenny Dep. at 81. However, the parties agree that, as director of special projects, Kenny was responsible for preparing Catholic Charities' submissions for *The New York Times*' annual Neediest Cases campaign and written materials to promote Catholic Charities and foster its mission, including content for Catholic Charities' blog. JSF ¶¶ 23–24.

Kenny may also have held the titles of staff writer and/or senior writer and editor at points during her tenure. *See* Kenny Dep. at 48–49. She testified that the job description for the "staff writer" position applied to her work before 2015. *See supra* note 4. At her deposition, she referenced a 2010 performance appraisal in which her role was listed as "Senior Writer and

---

[3] The Court cites to individual pages within exhibits by the pages' Bates-stamped numbers.

[4] Defendants provided a document that Costiglio attests was Kenny's job description while in that position. Costiglio Decl. ¶ 12; *id.*, Ex. A. But the document states that it describes the "staff writer" position. *Id.* And Kenny testified that it contained her job description before 2015. Kenny Dep. at 34–35. The description for the staff writer job lists among its responsibilities "providing writing services for the NY Times Neediest Cases campaign, publications and promotional materials, the Catholic Charities Website and Intranet, and stories and information for print media" and "providing other writing services as requested by the Director of Communications and Executive Director of Catholic Charities." Costiglio Decl., Ex A.

Editor." *See* Kenny Dep. at 48–49.  Exhibits submitted by both sides reflect that, whatever her

formal title, in 2019, Kenny signed her emails as "Director of Special Projects, Writer & Editor."

*See, e.g.*, Costiglio Decl., Ex. E; Klassen Decl., Ex. 19.  Kenny testified that she was "the main

writer" in the Department.  Kenny Dep. at 153.

### 3.    August 2016: Kenny and Other Women Complain About Co-Workers

In or around August 2016, Kenny and three other women in the marketing and

communications department reported concerns about another employee, Frederick Joseph, to

human resources director Jasper.  *See, e.g.*, Jasper Decl. ¶ 29; Kenny Dep. at 67–74.  The content

of the complaint is disputed to a degree.  Kenny attests that the women complained about

Joseph's inappropriate and sexual comments and discriminatory treatment of women workers.

*See, e.g.*, Frederick Decl. ¶¶ 12–13.  Defendants, while acknowledging Kenny's contrary

deposition testimony, state, vaguely, that the women reported "concerns"; citing Jasper's

testimony, they state that the complaints were that Joseph had taken credit for their work and

spoken to them condescendingly, not that he had sexually harassed them or subjected them to a

hostile work environment.  *See* Jasper Decl. ¶¶ 29, 32–33; Klassen Decl., Ex. 2 ("Jasper Dep.")

at 132; *see also* Kenny Dep. at 67–74.

Immediately after the complaint, Jasper began an investigation into Joseph's conduct and

met with Kenny and her three coworkers.  Jasper Decl. ¶¶ 29–31.  Jasper also met with Costiglio,

Joseph's supervisor, and attempted to meet with Joseph.  *Id.*  However, before Jasper could

conclude her investigation, Joseph resigned, effective September 15, 2016.  *Id.* ¶ 34.  Because

Jasper could not complete her investigation, she never determined whether the complaint was

substantiated.  *Id.*

In August 2016, Kenny and the same coworkers complained to Jasper about Costiglio's supervision of Joseph. *See* Jasper Dep. at 131. They contended that Costiglio had enabled Joseph's inappropriate behavior, Kenny Dep. at 70; Klassen Decl., Ex. 6 ("Kenny Decl.") ¶ 7. Jasper's investigation did not uncover any evidence of poor treatment or policy violations by Costiglio, but she recommended he receive general managerial training. Jasper Decl. ¶ 35; Jasper Dep. at 139; Klassen Decl., Ex. 5 ("Sullivan Dep.") at 135.

### 4.    Late 2016: Kenny Is Given a Proposed New Job Description

Kenny attests that, in late 2016, Costiglio presented her with a job description that would have changed her duties and title from director of special projects to senior writer and editor. Kenny Dep. at 39; Klassen Decl., Ex. 12. She contends that the hew job title was a demotion, Kenny Dep. at 41–44; *see also* Opp. at 2–3, and that Costiglio offered it to her in retaliation for the complaint she had filed against him, Kenny Dep. at 36. Kenny testified that "instead of being complimented or promoted for [her] success" with increasing readership, "people in positions senior to [her] had gathered together and decided to insult [her]" by offering her a job description with "a lower job title," one that phrased "things [she] was responsible for . . . in a passive tense" and "specifically said that [she] would spend time with vermin and bed bugs." Kenny Dep. at 42–44; *see also id*. at 41 (testifying that 2016 job description would have changed her title from director of special project to senior writer and editor).

In her 2021 deposition, Kenny testified that she refused to sign the new job description and was never again asked to sign it, *id*. at 37–38; that she continued to be referred to by her earlier title and that her responsibilities did not change, *id*. at 37; and that the new job description was never implemented, *id*. at 43; *see also id*. at 36 ("My understanding is that [the 2016 job description] was not accepted as a job description [after my refusal to sign], that it was ignored.

I continued to be called a director of special projects, not senior writer and editor.").  However, in a July 22, 2022 declaration submitted in connection with her opposition to summary judgment, Kenny attested that "after [she] refused to sign the [new job title,] [she] took on the title of Senior Writer and Editor in addition to [her] title of Director of Special Projects."  Kenny Decl. ¶ 13.

### 5.    2017: Gomez Is Promoted and de Palma and Davis are Hired

On January 9, 2017, Catholic Charities hired Fanny Gomez as a communications and marketing assistant.  JSF ¶ 16.  Gomez was under the age of 40.  Kenny Decl. ¶ 20.  At some point in 2017, Gomez was promoted to social media specialist.  Jasper Decl. ¶ 22.  In that role, Gomez was in charge of the organization's Facebook and Twitter presence, *see, e.g.*, Kenny Dep. at 82, and promoting it on social media, *see* Jasper Decl., Ex. B.  Costiglio made the decision to promote Gomez, Costiglio Decl. ¶ 6.  Gomez was not promoted further, Klassen Decl., Ex. 4 ("de Palma Dep.") at 278, and Kenny acknowledged that, even after Gomez's promotion, Gomez was in a "lower position" than Kenny, Kenny Dep. at 160.  Costiglio testified that he decided to promote Gomez because "the position was open and we needed to fill that void," he "preferred to fill it internally," and she had "shown some knowledge and skill in that area."  Costiglio Dep. at 243.

In October 2018, Jasper Decl. ¶ 24, John-Mark de Palma was hired as digital and web producer, *see* de Palma Dep. at 32; Klassen Decl., Ex. 8.  De Palma was then age 44 or 45.  *See* Opp. at 12 n.6; JSF ¶ 39.  In March 2019, Zachary Davis was hired as a communications and marketing coordinator.  Jasper Decl. ¶ 20.

### 6.   2017: Kenny Is Moved to a Smaller Desk

In 2017, the Marketing Department moved floors within the building.  *See* JSF ¶ 22; *see, e.g.*, Kenny Dep. at 50–51; Costiglio Dep. at 110.  Costiglio had a small office, de Palma took his predecessor's seat, in an office he shared with a rotation of "floating" workers, and the remaining four members of the department, including Kenny, worked in desks or cubicles in an open floor plan.  JSF ¶ 26; *see also* de Palma Dep. at 129–31.  Sullivan testified that Catholic Charities "reconfigured the space so that [the Marketing and Development departments] would be in closer proximity to each other."  Sullivan Dep. at 194.

Kenny testified that, when the department moved floors, she was relocated from an office to a desk that was "in a hallway."  Kenny Dep. at 114.  Sullivan testified that, in her role as author of the department's outward-facing content, Kenny needed to be closer to the Development Department so that she could "know their work with donors" and craft her writing to "the interests of donors."  Sullivan Dep. at 195.  Kenny counters that she was "the only person given one desk instead of two desks," Kenny Dep. at 114, that "her colleagues had a private office or two desks in a full cubicle," Opp. at 21, and that she was given this inferior seating position in retaliation for her August 2016 complaints, *see id.*  She testified that she thereupon complained that she could not work at her small desk.  Kenny Dep. at 153.  One large office had been assigned to two women; when one was not at the office, Kenny worked at her desk.  *Id.*  Kenny testified that, between a week and month after the move, a second desk was added to Kenny's and a partition was installed, making her workspace comparable to others' in the department.  *See id.* at 153–54.

### 7.      The 2018 Website Redesign and the March 2019 Email

Between late 2018 and early 2019, Catholic Charities redesigned its website's homepage. de Palma Dep. at 47–48, 108.  Sullivan, Costiglio, de Palma, Sandy Strk (the marketing manager), an external design vendor, and a consultant decided together to redesign the website. Costiglio Dep. at 75–76.  De Palma testified that the redesign coincided with a strategic push "to create harder-hitting content" that was "more news-like" and to retire—or at least diminish Catholic Charities' reliance on—blog posts.  *See* de Palma Dep. at 110–14; *see also id.* at 109 (describing the "styling change[]" as from "soft content" to "clickbait").  Costiglio testified that the news stories were intended to be shorter than blog posts and focused on global activities. Costiglio Dep. at 76.

On March 14, 2019, Costiglio emailed Kenny, JSF ¶ 27, copying, among others, de Palma, Strk, and Davis, *see* Klassen Decl., Ex. 20.  Costiglio wrote that, "[g]iven how [their] workload has evolved in the department, he "would like to make a change in the division of labor regarding writing for the website." *Id.*  Specifically, he asked that Kenny "take on the added task of pulling together the important copy that needs to be created for each of the four news features each week." *Id.*  He wrote that "[de Palma] has been handling this task," but "after an audit this week of [de Palma's] workflow, [Costiglio] learned that it is taking considerable time away from other priorities that are more directly in line with his job description and the deliverables I need [from] him." *Id.*  De Palma's job description did not include writing news articles or producing written content.  *See* Costiglio Decl., Ex. C; *see also* Jasper Decl. ¶ 40 ("[Costiglio] explained that he reassigned the news feature to Ms. Kenny because she, rather than Mr. de Palma, was responsible for the preparation of written content and because he needed Mr. de Palma to focus on optimizing the visibility of the website.").  In his email, Costiglio also stated that "when it

comes to the submission of content for any of our web platforms," Kenny should "consider that to be [her] final touchpoint with that piece of content."  Klassen Decl., Ex. 20.  From that point on in the production process, he wrote, "[Davis] and [de Palma] are both equipped and trained to take it from there without altering anything editorially" and to "mak[e] sure it meets best practices for web publishing and structure."  *Id.*  Costiglio's email proposed "set[ting] up . . . a mini boot camp where we go through how best to publish for the web, both in content and structure" so that "all of us [will] be on the same page" and "to make sure everyone is up to speed on best practices."  *Id.*

On March 15, 2019, Kenny emailed a response to Costiglio, with multiple objections. Klassen Decl., Ex. 20; JSF ¶ 28.  First, she wrote that, by copying other members of the department, Costiglio's email indicated that he "ha[d] spoken to [her] coworkers . . . before drafting the email and sending it to [her]," which "disrespect[ed]" her and "amount[ed] to a difference in treatment of [her] compared to others" and "an adverse change in [her] work environment."  *Id.*  Second, she stated that, unless Costiglio authorized her to lead the weekly staff meetings that de Palma had run when he authored the news articles, the additional task "diminishe[d] [her] current status and the environment in which [she] work[ed]."  *Id.*  Third, Kenny objected to Costiglio's "add[ing] additional oversight to [her] work" and stated that she "d[id not] understand . . . the benefit of changing the work pattern of [her] content submission"; she claimed that de Palma and Davis had "altered [her work] editorially . . . without discussion with [her]" in "recent months" in ways that introduced errors.  *Id.*  Kenny did not object to the boot camp.  *Id.*  To the contrary, she thanked Costiglio for "agreeing in this email to [her] earlier requests that [their] staff meet again so that [they] could be informed and, in turn, implement best

10

practices for the evolving field of publishing on the web," and suggested various times for "this boot camp." *Id.*

Although Costiglio again requested on May 8, 2019 that she write the news articles, *see* Klassen Decl., Ex. 17, Kenny never wrote them—and largely refused to do so for the duration of her employment. *See* Costiglio Dep. at 107–08 (de Palma ended up writing news articles); Pl. 56.1 ¶ 36.3 (not disputing de Palma wrote news summaries); de Palma Dep. at 87–88 (Kenny refused to write news articles because "[s]he felt it was too much work"); Jasper Decl. ¶ 43; Costiglio Decl. ¶ 37; *see also* Pl. 56.1 ¶ 36.3 (disputing only whether the articles were short summaries or "more news-like," not that de Palma had written them); Kenny Dep. at 93 ("[de Palma] continued to write most of those four stories during the period between when I filed my grievance with Catholic Charities [on March 25, 2019] and when I received my response [on May 14, 2019.]").

In this litigation, Kenny has stated that before Costiglio's March 14, 2019 email, she "had ultimate editing authority and final say on her posted work," and has asserted that defendants "demoted" her, in part, "by taking away her editing responsibilities." Opp. at 2–3. It is, however, disputed whether, after the March 14, 2019 email, de Palma had authority over the subject matter of Kenny's work. Kenny claims that "[d]e Palma, a younger man with significantly less experience than [Kenny] told her what subjects to write about for news stories." *Id.* at 3; Kenny Dep. at 116 (de Palma would run staff meetings and "ask[] the staff to come up with ideas for four [news] stories"). *But see* de Palma Dep. at 108 ("I can't assign her work."). Costiglio testified that the Marketing Department, as a group, was responsible for deciding the subject matter of news stories and posts, Costiglio Dep. at 84, and held meetings "to generate ideas," *id.* at 89–90; that team members were free to "express their opinions about the viability of

11

a particular story at any time," *id.* at 85; and that although de Palma wrote the news articles, this meeting-based process determined the articles' subject-matter. *Id.* at 91–92 ("Q: So when [de Palma] started doing it, was it the same process that we just described? A: Yes.").

Costiglio also testified that "[n]obody other than [he] could have given [Kenny] th[e] direction" to write on a specific subject, *id.* at 85, and that he could not recall ever doing so. *Id.* at 85–86; *see also id.* at 88 ("Q: Could anybody else tell [Kenny] what article to do? A: No."). He also testified that, "even with the blog," he could have vetoed Kenny's chosen content if he disagreed with it. *Id.* at 90–91.

### 8.    Spring 2019: Catholic Charities' Website Is Flagged for "Churning"

In spring 2019, Google "downgraded" Catholic Charities' website as a penalty for "churning," or "duplicat[ing] content with the intention of making the search results work in [its] favor." de Palma Dep. at 226; *see also* Jasper Dep. at 164. De Palma testified that this situation arose because "the same content appear[ed] in two separate locations on the website"—the news section and blog. de Palma Dep. at 228–29. Also during this period, de Palma began posting summaries of Catholic Charities' blog posts, which Kenny had prepared, under his byline. *See id.* at 202–06.

According to de Palma, these practices—the duplication of content and his summary of Kenny's posts—occurred because Catholic Charities "didn't get someone to write in the news section" after Kenny had refused to do so, and "had these two pieces of content that had to be fed." de Palma Dep. at 301; *see also id.* at 232 (asserting that Kenny's refusal to write news articles led to churning problem); *id.* at 233 ("She was asked to produce content for the news section which she declined to do. She was also asked to write summaries which she declined to do, which led down the road of churning."). For her part, Kenny claimed that de Palma had

plagiarized her work by posting summaries of her blog posts and other news outlets' stories

under his name on Catholic Charities' website.  Kenny Dep. at 84.

### 9.    March 25, 2019: Kenny's Grievance

On March 25, 2019, Kenny submitted a written grievance to Jasper.  JSF ¶ 29; *see also*

Jasper Decl. ¶ 36; *id.*, Ex. C.  She complained of discrimination and retaliation, an effective

demotion, and a hostile work environment.  Jasper Decl., Ex. C.  Kenny pointed to the following

conduct by Costiglio: (1) his insertion of "two men . . . to roles overseeing my work by giving

them final control and authority over the blog's content and presentation"; (2) his "sp[eaking]

with others about changing [her] job duties without including [her] in the discussion," as

evidenced by his March 14, 2019 email copying her coworkers; (3) his "foster[ing] of a hostile

work environment" because "[f]ellow staff now address [her] in a high-handed manner while,

with [Costiglio's] support, they insert errors into [her] work" that "fall over the line into

plagiarism"; and (4) his "refus[al] to even acknowledge receipt of [her March 15, 2019] email"

and "us[e] of the silent treatment as a form of retaliation for [Kenny] having complained."  *Id.*

### 10.    May 14, 2019: Denial of Kenny's Grievance

Jasper began an investigation, in which he met with Kenny multiple times and with

Costiglio and Strk once each.  JSF ¶ 29.  On May 14, 2019, Jasper notified Kenny that the human

resources department, after a thorough investigation, had denied her grievance.  Jasper Decl., Ex.

E.  As to Kenny's complaints, the investigation found that: (1) Kenny had not experienced a

change in her job responsibilities, description, title, salary, benefits, or other terms and conditions

of her employment; (2) Kenny had not cited any examples, and the investigation had not

uncovered any, of disparate treatment; (3) Kenny had not identified, and the investigation had

not uncovered, protected activity on Kenny's part or retaliatory actions by Catholic Charities or

Costiglio; (4) Kenny did not provide evidence, and the investigation did not uncover any, of a

hostile work environment; and (5) Kenny did not identify and the investigation had not found evidence of plagiarism. Jasper Decl., Ex. E; *see also* Jasper Dep. 212–13 (noting that Kenny had the highest salary of anyone in the Marketing Department other than Costiglio, despite working part-time). As to the final point, Jasper noted that Catholic Charities' handbook specified that all written work product was the agency's sole property, not that of an employee. Jasper Decl. ¶ 47.; *see also* Jasper Decl., Ex. A at 38.

### 11.    Kenny's Work Environment After Denial of the Grievance

Kenny testified that the denial of her grievance made her feel that her "workplace was intolerable," and perceive that "[d]efendants wanted [her] to resign." Kenny Decl. ¶ 19; *id.* ¶ 18 (she felt "forced to resign"). She testified that her co-workers "stopped inviting [her] for lunch," began walking to the train station without her, and "spoke to [her] only when they needed to." Kenny Dep. at 164; *see also* Jasper Dep. at 214.

Kenny also faulted Sullivan for several behavior patterns after this point that, she says, further alienated her. First, Sullivan would "continually" reference performers Jennifer Lopez ("J-Lo") and Beyoncé. *See* Kenny Dep. at 119. This included a reference in the "Notes About the Author" section of a book he wrote, in which he described "flowing church vestments and JLO's scant stage attire catch[ing] [Sullivan's] eye." *See* Klassen Decl., Ex. 24.[5] Second, Sullivan placed a life-size cutout[6] of Beyoncé in revealing stage attire in front of his office's glass doors; the parties dispute when this was displayed. *Compare* Klassen Decl., Ex. 6 ¶ 22

---

[5] Sullivan testified that a friend of his, Deborah Darrell, wrote that description, although he reviewed and edited it. *See* Sullivan Dep. at 243–44.

[6] Kenny disputes defendants' description of the Beyoncé image as a "poster," terming it instead a "cut-out." *See* Pl. 56.1 ¶ 67.1. Defendants elsewhere refer to the Beyoncé image as a cutout, *see* Def. 56.1 ¶ 78. The parties do not dispute that the image was life-size. *See, e.g.*, *id.* ¶ 79 ("The poster is a life-size cutout of Beyoncé wearing concert stage attire.").

(cutout up through April 2019), *with* Jasper Decl. ¶ 60 (cutout up only through April 2018).

Sullivan also twice used the Beyoncé cutout as a prop in other communications.  *See, e.g.*, Def.

56.1 ¶ 82 (Twitter video where Sullivan affixed a comment bubble reading "Happy

VaLENTine"); Klassen Decl., Ex. 26 (photo of cutout with comment bubble that reads, in part,

"MY ADVICE: PRAY [indecipherable] & CARE MORE").  Finally, Kenny testified, Sullivan

spent an "inordinate amount of time" with Gomez, "looked for opportunities to spend time with

her," Kenny Dep. at 137–38, and singled her out by selecting her to travel with him on a work

trip to Central America, *id.* at 118.[7]  Kenny testified that Sullivan spent "inordinate amounts of

time in what appeared an inappropriate way with what he thought was a hot, younger woman,"

*id.* at 119—time Sullivan had not spent with Gomez's predecessor, an "average looking woman,"

*id.* at 137.  Kenny's March 2019 grievance had not referenced Sullivan or claimed a gender-

based hostile work environment.  Jasper Decl., Ex. C.

### 12.    April 2019: Kenny's EEOC Charge

On April 30, 2019, Kenny filed a charge of discrimination with the U.S. Equal

Employment Opportunity Commission ("EEOC") alleging discrimination based on her sex and

age, and retaliation.  Jasper Decl., Ex. E ("EEOC Charge").  The Charge mentions Sullivan's

references to J-Lo and Beyoncé, and the Beyoncé cutout.  *See generally* EEOC Charge.  On May

26, 2019, Catholic Charities received notice of the Charge.  *Id.* ¶ 56.  In January 2020, the EEOC

sent Kenny a Dismissal and Notice of Rights.  *Id.* ¶ 57.  The parties dispute whether Kenny

received, or whether EEOC merely mailed, the Charge on January 28, 2020.  *Id.*

---

[7] Sullivan testified that he selected Gomez to join him "[b]ecause of her position as social media manager" and the "need[] to publicize the trip through social media."  Sullivan Dep. at 210.

### 13.      May 20, 2019: Kenny Resigns

On May 20, 2019, Kenny gave four-week notice of her resignation from Catholic Charities, effective June 14, 2019.  JSF ¶ 35; Jasper Decl., Ex. F.  At no point during her tenure there had she ever been disciplined.  JSF ¶ 37.

On June 14, 2019, the date of Kenny's separation, her salary was $110,316.31 annually for a 30-hour work week.  Jasper Decl. ¶ 55.  At that time, the other Marketing Department employees' salaries were as follows: Costiglio earned $132,612.50 annually, Jasper Decl. ¶ 55, as director of communications and marketing, JSF ¶ 6; Strk earned $95,790 annually, Jasper Decl. ¶ 55, as marketing manager, JSF ¶ 15; de Palma earned $80,000 annually, as digital and web producer, *id.* ¶¶ 18, 38; and Davis earned $21.98 hourly, as a marketing associate, *id.* ¶ 38.  Jasper was age 64, Costiglio was 45, de Palma was 45, and Strk was 40.  Jasper Decl. ¶ 56.  At the time, nine of the 22 members of Catholic Charities were women over the age of 40.  *Id.* ¶ 15.

### B.      Procedural History

On April 26, 2020, Kenny filed the original complaint.  Dkt. 1.  On November 16, 2020, defendants answered.  Dkt. 16.  On April 5, 2021, after mediation proved unsuccessful, Kenny moved to file an amended complaint.  Dkts. 23, 26.  On April 15, 2021, after defendants took no position on Kenny's filing of an amended complaint, the Court granted Kenny's motion.  Dkts. 27–28.  On April 16, 2021, Kenny filed her amended complaint.  Dkt. 29 ("AC").  On April 30, 2021, defendants answered.  Dkt. 30.

On May 27, 2021, the Court held an initial pretrial conference.  On May 28, 2021, the Court issued, *inter alia*, a case management plan and scheduling order, Dkt. 34.  On September 15, 2021, Dkt. 37, October 21, 2021, Dkt. 41, and January 5, 2022, Dkt. 43, Kenny moved for extensions to complete discovery, which were all granted.  See Dkts. 38, 42, 44.  On February 17, 2022, Kenny moved to extend discovery a fourth time.  Dkt. 46.  On February 23, 2022, the

16

Court granted a shorter-than-requested extension of fact discovery, to March 25, 2022.  Dkt. 47.

On February 24, 2022, Catholic Charities moved for another extension, Dkt. 48; on February 25,

2022, the Court denied this request, Dkt. 49.  On March 25, 2022, Kenny requested an extension

of the discovery deadline for the limited purpose of defendants producing specific documents

referenced in depositions, Dkt. 50, and the Court granted the request, Dkt. 51.

On May 2, 2022, the Court held a conference and set a schedule for briefing defendants'

motion for summary judgment.  On May 27, 2022, the parties submitted their joint stipulation of

undisputed facts.  Dkt. 56.  On June 24, 2022, defendants moved for summary judgment, Dkt. 59

("Motion"), and filed a supporting memorandum of law, Dkt. 60, Rule 56.1 Statement, Dkt. 61,

and declarations and accompanying exhibits, Dkts. 62–65.  On July 22, 2022, Kenny opposed the

Motion, Opp., and filed a counter Rule 56.1 statement, Dkt. 67, and a declaration and

accompanying exhibits, Dkt. 68.  On July 26, 2022, defendants requested an extension to file

their reply, Dkt. 69, which the Court granted the same day, Dkt. 70.  On August 12, 2022,

defendants replied.  Dkt. 71 ("Reply").

## II.    Legal Principles Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132

(2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less in discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant

summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III.   Discussion

Kenny claims that, despite producing high-caliber work for Catholic Charities' blog and having greater seniority and training than her Marketing Department peers, she was ostracized, effectively demoted, and retaliated against, and that these actions were the result of gender and age discrimination.  She also claims that she was subjected to a gender-based hostile work environment.  Defendants respond, *inter alia*, that the evidence adduced, viewed in the light most favorable to Kenny, could not support various elements of a discrimination claim.  These include that Kenny experienced an adverse employment action, and that the actions about which she complains were the product of gender or age discrimination, as opposed to legitimate, non-discriminatory bases.  Defendants argue that the evidence also cannot support the AC's claims of a hostile work environment or retaliation.

The Court evaluates the AC's federal law claims first.

### A.    Title VII: Gender Discrimination[8]

#### 1.   Applicable Legal Standards

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII discrimination claims are analyzed under the burden-shifting framework described in *McDonnell*

---

[8] Although the AC brings age discrimination claims under the NYSHRL and NYCHRL, AC at 17–19, it does not allege age discrimination under the applicable federal law, to wit, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*  Title VII does not encompass claims for employment discrimination on the basis of age.  *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 391 (S.D.N.Y. 2011).

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Holcomb*, 521 F.3d at 138. To do so, the plaintiff must show that she (1) "belonged to a protected class"; (2) "was qualified for the position [s]he held"; (3) "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138).  The burden of establishing a *prima facie* case in an employment discrimination action is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

If the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)).  The burden of production then shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (employer's burden is "one of production, not persuasion").

If the employer satisfies that burden, the presumption of discriminatory intent "drops out of the analysis," and "the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).  The plaintiff, however, is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision.  *Holcomb*, 521

F.3d at 138 (citation omitted); *see also* 42 U.S.C. § 2000e-2(m) (race, color, or sex must be "a

motivating factor" for employment decision).  Still, "a plaintiff must provide more than

conclusory allegations of discrimination to defeat a motion for summary judgment."  *Schwapp v.

Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).  A plaintiff cannot defeat a summary judgment

motion by "offering purely conclusory allegations of discrimination, absent any concrete

particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### 2.  Discussion

In considering whether the evidence adduced make out a *prima facie* case of gender

discrimination, the Court (1) notes that as a woman, Kenny is a member of a protected class, and

(2) assumes that, as a graduate of Columbia University's Graduate School of Journalism, a

former professor, and long-time reporter, Klassen Decl., Ex. 9, Kenny was qualified for her job.

*See Smith v. N.Y. & Presb. Hosp.*, 440 F. Supp. 3d 303, 328–29 (S.D.N.Y. 2020).  Defendants,

however, argue, *inter alia*, that the evidence cannot sustain the third element: that Kenny

experienced an adverse employment action.  Mem. at 5–8.  The Court agrees.  Even viewing the

evidence in the light most favorable to Kenny, a reasonable trier of fact could not find that she

suffered such an action.

An adverse employment action is a "materially adverse change in the terms and

conditions of employment."  *Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir.

2004) (citation omitted).  "To be materially adverse, a change in working conditions must be

more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2007) (quoting *Sanders*, 361 F.3d at 755).

"Examples of such a change include termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular situation." *Id.*
(quoting *Sanders*, 361 F.3d at 755).

Here, Kenny terms two circumstances adverse employment actions.  These are (1) being
assigned additional news article responsibilities, and (2) losing, to younger male coworkers, her
editorial authority and control over the subject matter of written pieces.  Opp. at 2–4.[9]  For the
reasons that follow, on the evidence Kenny has adduced, neither of these events qualifies as an
adverse employment action.  Kenny alternatively argues that she was constructively discharged.
*Id.* at 5–8.  The evidence does not support this claim, either.

**_Assignment to Kenny of new responsibilities regarding news articles_**:  Kenny argues
that Costiglio's assignment to her of news article responsibilities in March 2019 following
Catholic Charities' website redesign was an effective demotion, because it positioned her to take
on added work without a commensurate salary increase.  Opp. at 2–3.  This argument fails, for
several reasons.

First, although the parties dispute whether Costiglio requested short summaries or more
substantive write-ups, the record, including Kenny's testimony, uniformly reflects that Kenny
never, in fact, took over the news-article responsibility from de Palma that Costiglio's email had

---

[9] In her deposition, Kenny testified that her coworkers "stopped inviting [her] for lunch," began
walking to the train station without her, and "spoke to her only when they needed to."  Kenny
Dep. at 164; *see* Jasper Dep. at 214.  Kenny does not argue that these were adverse employment
actions, treating them as germane only to her claim of constructive discharge.  *See* Opp. at 2–4.
For avoidance of doubt, this conduct would not constitute an adverse employment action.  *See,
e.g.*, *Mabry*, 769 F. Supp. 2d at 394 (no adverse action where supervisor had not spoken to
plaintiff for more than a year or invited him to management meetings); *Trachtenberg v. Dep't of
Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (relocation of plaintiff from
office to windowless, poorly ventilated room not an adverse employment action); *E.E.O.C. v.
Bloomberg L.P.*, 967 F. Supp. 2d 816, 847–48 (S.D.N.Y. 2013) (ostracization by senior
management and failure to give employee desk or telephone for months not adverse employment
actions).

envisioned.  *See* Pl. 56.1 ¶ 36.3 (disputing only whether articles were short summaries or "more news-like"—not that, before March 15, 2019, de Palma had written them); Kenny Dep. at 93 ("[De Palma] continued to write most of those four stories during the period between when I filed my grievance with Catholic Charities [on March 25, 2019] and when I received my response [on May 14, 2019].")[10]; Klassen Decl., Ex. 21 (in April 11, 2019 email, Kenny referencing "[de Palma's] four synopses of news articles" with "my blogs"); Costiglio Dep. at 108 ("[de Palma] ended up filling the void [as] was necessary to get the work done that was necessary for our department."); Costiglio Decl. ¶ 37 (Kenny "refused to perform her assigned tasks, which affected the workflow of the entire Department"); de Palma Dep. at 87–88 (Kenny refused to write news articles because "[s]he felt it was too much work"); Jasper Decl. ¶¶ 43–44 (describing Kenny's "refusal to perform work as assigned").  Thus, the heightened workload that Kenny claims would have been an adverse employment action never materialized.  *Cf. Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (disciplinary action did not constitute adverse employment action where it was later rescinded); *Schiano*, 445 F.3d at 608–09 (no adverse action where, even assuming change in reporting structure would have been adverse action, it was rescinded the day after plaintiff's complaint).

Second, even assuming Kenny had taken on the new editorial duties, in general, "[t]he assignment of a challenging workload is not sufficiently adverse to support either a discrimination or a retaliation claim" absent more.  *Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (citation omitted); *see, e.g.*,

---

[10] Kenny sent a resignation letter on May 20, 2019, Pl. 56.1 ¶ 54.1, and her last day was June 14, 2019, *id.*  Kenny did not return to her regular work schedule between submitting her resignation letter and June 14, 2019, although she went into the office "some."  Kenny Dep. at 129 ("I had a lot of sick days, I had a lot of vacation days; so, no, I did not come into the office much.").

*Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 210–11 (E.D.N.Y. 2013)

(requirement that plaintiff teach two classes in addition to administrative duties not a *material*

change in employment, where title and salary remained the same).  A plaintiff so claiming must

show more.  "[A]n increase in workload may sometimes be an adverse action for the purposes of

a retaliation claim if the increase is heavily disproportionate to other employees similarly

situated."  *Hiralall v. Sentosacare, LLC*, No. 13 Civ. 4437 (GBD), 2016 WL 1126530, at *13

(S.D.N.Y. Mar. 18, 2016), *appeal dismissed*, No. 16-1047 (2d Cir. 2016).  Here, however, Kenny

has not adduced any evidence that her workload was heavier than that of her colleagues, let alone

disproportionately so.  To the contrary, the record supports the opposite conclusion:  It was de

Palma, not Kenny, who shouldered most—if not all—of the additional responsibilities regarding

news articles after Kenny demurred to take on such work.  *See, e.g.*, Costiglio Dep. at 107–08.

Third, the record is silent as to how Kenny's workload, even if she had completed the

articles as assigned, would have compared to that of others in the Department.  It thus would not

permit Kenny to argue that her resulting workload would have been heavily disproportionate to

those of similarly situated employees.  Kenny instead states that her new workload would have

exceeded her existing workload.  *See* Opp. at 2–3 ("Defendants effectively demoted Plaintiff by

assigning her more work with no salary increase.").  But a mere increase in workload, without

more, is not an adverse employment action.  *See, e.g.*, *Young v. Rogers & Wells LLP.*, No. 00

Civ. 8019 (GEL), 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002) (no adverse employment

action where employee given more work but did not show that new tasks were of a different kind

than before or that the later workload was unusually heavy); *Hiralall*, 2016 WL 1126530, at *13

(same); *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 127–28 (S.D.N.Y. 2020) (no

adverse employment action where additional work duties merely altered existing job

responsibilities); *Ahmad v. N.Y.C. Health & Hosps. Corp.*, No. 20 Civ. 675 (PAE), 2021 WL 1225875, at *21 (S.D.N.Y. Mar. 31, 2021) (workload not heavily disproportionate to others where employee was not obligated to work more hours as a result of understaffing); *Richards v. Dep't of Educ. of City of N.Y.*, No. 21 Civ. 338 (LJL), 2022 WL 329226, at *9 (S.D.N.Y. Feb. 2, 2022) (work assignment not heavily disproportionate to others where colleague had fewer cases with plaintiff's team, but also worked for another team).  And "assignments within an employee's job description are generally not materially adverse."  *Forest v. N.Y. State Off. of Mental Health*, 672 F. App'x 42, 45 n.3 (2d Cir. 2016) (summary order).  Here, Kenny does not dispute that significant parts of the assignment envisioned by Costiglio fell within her existing job description.  *See* Pl. 56.1 ¶ 29 (not disputing that Kenny was responsible under her existing job description for "preparing written materials . . . in order to promote Catholic Charities and foster its mission," although disputing that she was responsible for annual reports, press releases, and "future releases").

*Assignment to others of editing responsibilities previously belonging to Kenny*:  Kenny alternatively argues that she was effectively demoted when defendants "stripped [her] of her editing responsibilities" and gave these to de Palma and Davis, "younger men with less experience."  *See* Opp. at 3–4; *cf.* Kenny Dep. at 143 (claiming Davis harassed her by editing her work and inserting errors and "plagiarisms," and de Palma harassed her "in the same way" and by being "put in charge of [her]").  Kenny states that before Costiglio's March 14, 2019 email, she had "ultimate editing authority and final say on her posted work, including style, links added, pictures, and actual copy," but that thereafter, de Palma and Davis "had the ability" to change titles, phrases, and images, remove links, restructure sentences, substitute words, or otherwise change Kenny's draft without her approval.  Opp. at 3.  Defendants acknowledge that, before the

email, de Palma sent copy that had been optimized for the website to Kenny for review, whereas afterward, he sent such copy directly to Costiglio.  *See* Mem. at 6; de Palma Dep. at 153.

For several reasons, viewing the facts in the light most favorable to Kenny, Catholic Charities' alteration of its editorial process did not reduce her role to a point where it constituted an adverse employment action.  "Changes in assignments or responsibilities that do not radically change the nature of work are not typically adverse employment actions."  *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (internal quotation marks omitted) (female employee's claim that she could not assign work to subordinates or evaluate them, while male supervisors could, not an adverse employment action, as it equated to a mere inconvenience or an alteration of job responsibilities); *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (underutilization of employee's skills not adverse employment action); *Pollock v. Shea*, 568 F. Supp. 3d 500, 508 (S.D.N.Y. 2021) (adverse employment action requires "more than a mere inconvenience or de minimis change in job responsibilities").

First, by Kenny's own account, far from her previously having had vast editorial authority, her authority had been more modest—to wit, to correct errors that Davis and de Palma introduced in the course of optimizing (preparing) her content for Catholic Charities' website. *See* Kenny Dep. at 83 ("[O]nce the story was input onto the blog, the technical part, I would go back in . . . and see how it looked and change it if . . . the person who filed it onto the computer had made a mistake . . . I would correct it."); *id.* at 85 (Davis would, at times, "input [her work] in a way that didn't look right," and she "would go in there and correct [his errors]"); *id.* at 91 ("Multiple times after [the March 2019] email, I would show [Costiglio] errors that [de Palma and Davis] inserted into the published work that was going to make Catholic Charities look bad."); *id.* at 90 ("From that point on I was locked out of the website and could no longer make

26

changes."); *see also* Opp. at 12 ("Previously, [Kenny] and de Palma had a relationship where any suggestions he had to optimize the website views were given to [Kenny], and they would work together to determine the final product.").[11]  De Palma and Davis's duty of optimizing blog posts involved the workmanlike and non-substantive functions of adjusting for "key words so that [the post] trends correctly," and ensuring that a post is "searchable; that the titling matches the correct formatting and style for titling, the correct word usage, the correct length."  de Palma Dep. at 39. Kenny has not identified any support for her conclusory claims that, after mid-March 2019, Davis and de Palma made substantive alterations while reviewing her work, or that they were authorized to do so, rather than merely optimizing it for the website.  *See* Kenny Dep. at 90 (describing de Palma and Davis's changes to her work); Jasper Dep. at 176 (he understood Davis and de Palma as not having authority to change substance of Kenny's work); Costiglio Dep. at 198 ("They weren't overseeing her work, they didn't have final control and authority.  They

---

[11] Defendants do not dispute Kenny's characterization of herself as having, before March 2019, final authority over Catholic Charities' blog content.  But Kenny has not adduced evidence that this authority in practice entailed making substantive modifications.  *See* Opp. at 3 (citing de Palma Dep. at 54, 56; Kenny Dep. at 160).  The cited portions of Kenny's Rule 56.1 statement cite, in turn, portions of de Palma's deposition testimony describing the Department's switch from an iterative editing process, in which he and Kenny had exchanged drafts until "at some point a final version would be handed to me . . . [a]nd then it would be posted," de Palma Dep. at 55–56, to one in which Kenny was uninvolved in editing after she sent her draft to de Palma, *id.* at 166–67.  Fairly read, this evidence suggests that although Kenny had had the opportunity to object to changes de Palma introduced, in practice, eliminating that aspect of her role did not strip her of substantive review authority.  And others' testimony undermines Kenny's claim to have had "ultimate editing authority."  Opp. at 3.  Costiglio stated that such responsibility lay with him, as the marketing department's director.  *See, e.g.*, Costiglio Dep. at 97 ("Q: Before the website redesign, once something was posted, if [Kenny] wanted to make a change, could she?  A:  Not without my approval."); *id.* at 178 ("[L]ast touch point had always been . . . sending it to [Costiglio]" prior to website redesign.).  The declaration of former website manager Klassen, which Kenny submitted, did not refute this.  *See* Frederick Decl. ¶ 2 (stating that, prior to the website redesign, Kenny could "login and edit her own writing at any time, even if I had already posted it," but not addressing whether Kenny required authorization from Costiglio before doing so).

had—they executed the final step . . . optimizing and posting it to the website."); de Palma Dep. at 38 ("Q:  So could you make changes to things that the staff writer gave you? A:  As far as for the web, yes.").  In sum, save Kenny's unsubstantiated claim about the actions of others outside of her presence, there is no evidence that in March 2019, others were given, or took over, editorial authority that had been taken from Kenny.

Second, even if there were evidence that de Palma and Davis had been authorized to make substantive (non-optimization) changes to Kenny's work, and even if Costiglio's March 2019 email were construed to have thusly redistributed substantive editing responsibilities, the change in Kenny's role is a far cry in scope and scale from the changes at issue in cases finding departmental reorganizations to constitute adverse employment actions.  *See, e.g.*, *Signer v. Tuffey*, 66 F. App'x 232, 236 (2d Cir. 2003) (summary order) (adverse employment action where community services unit director and public information officer lost exclusive command of subordinates—such that, thereafter, a subordinate received only 20% of assignments from her and no new officers were assigned to her; lost her public information officer title and duties; and was relocated to a basement office next to building's garbage area); *Pollock*, 568 F. Supp. 3d at 508–09 (chief of crime control strategies, who had overseen 300 staff members, transferred to chief of collaborative policing, where she supervised only nine people).  Nor do the facts indicate or the parties suggest that, after Costiglio's March 2019 email, Kenny was relegated to performing only menial aspects of her responsibilities.  *See, e.g., Wallen v. Teknavo Grp.*, No. 12 Civ. 6196 (MKB) (SJB), 2019 WL 1435879, at *12 n.19 (E.D.N.Y. Mar. 30, 2019) (if senior associate suddenly found herself doing *only* document review, she may have suffered adverse employment action because "[e]ven if discovery and document review [are] within [her] 'scope of work,' a sudden reassignment to menial tasks alone can be an adverse employment action").

Third, to the extent that Kenny broadly contends that defendants stripped her of "[her] ability to choose her own subject matter" and gave it to de Palma, making him, in practice, her supervisor, the admissible evidence would not permit a reasonable jury to find that, after March 2019, de Palma decided upon the publishable content of Kenny's writing. *See* Opp. at 3–4. Kenny notes that de Palma ran meetings at which the staff generated content ideas—a duty she claims to have been hers alone, *see* Opp. at 3 (citing Kenny Dep. at 116)—and attests to one instance where de Palma "told [her]" to adapt a blog post into a news article for Catholic Charities' website, *see id.* (citing Kenny Dep. at 106); *see also* Klassen Decl., Ex. 17 (email discussing meeting where de Palma "told [her]" what to write). But this claim fails for several reasons.

For one, the record evidence—including Kenny's own testimony—does not support her claim, *see* Opp. at 3, that, before the March 2019 email, she had unilaterally chosen the subject matter for her blog posts (or any other content). This evidence points to a collaborative process in which pre-publication approval by Costiglio was needed. *See*, *e.g.*, Kenny Dep. at 82 ("I did choose largely on my own, although I would report to . . . Costiglio the [blog] stories that I was going to cover."); Costiglio Dep. at 18–19 (Kenny "typically generate[d] ideas" for blog posts, but to determine which ones "made the cut," Kenny would "draft something and send it to [Costiglio] for approval"); *id.* (Kenny could not post without Costiglio's prior approval); *id.* at 85 (conversely, no one could direct Kenny to write on a particular topic); *see also* de Palma Dep. at 62 (Neediest Cases stories also needed approval); Costiglio Dep. at 91 ("The subject matter [of news articles] was not a group *decision*. It was a group *process* that was ultimately decided on by myself as the ultimate decision-maker." (emphases added)).

29

For another, even assuming that Kenny had been the primary generator of ideas for blog posts, *contra* Costiglio Dep. at 84–85 (noting that "[p]eople were free to pitch ideas"), the record reflects that the process for identifying ideas for news articles was more collaborative. *See, e.g.*, *id.* at 102 (describing how, after Kenny refused to write news articles, Costiglio "reassigned it to be more of a collaborative process" that "[they] would get . . . done as a team"); *see also id.* at 76–77 (distinguishing blog posts and news articles). Kenny conflates the two processes: To support her claim that defendants "took [her] ability" to select her blog posts topics, she cites only to parts of the record discussing the selection of news article topics. *See* Opp. at 3 (citing Kenny Dep. at 106, 116; de Palma Dep. at 46, 114; Costiglio Dep. at 180) (discussing meetings to generate news article ideas)); *see also* Klassen Decl., Ex. 17 (email reporting de Palma's request that she write news article).

For yet another, as to de Palma, Kenny's evidence of his assumption of editorial duties earlier belonging to her is threadbare. Kenny implies only that he directed her content with respect to news stories. *See* Opp. at 3 (arguing that de Palma "told her what subjects to write about for the news stories"). Despite asserting in her March 2019 grievance that Costiglio gave control over the "blog's content" to de Palma and Davis, Jasper Decl., Ex. C, Kenny has not come forward with evidence of any instance in which de Palma instructed her to write a blog post on a given topic. The record reflects only that de Palma *once* asked her to write a news story based on a mental health blog post she had written.[12]  *See* Klassen Decl., Ex. 17 (de Palma

---

[12] This one incident appears insufficient to support the premise underlying Kenny's first theory of an adverse employment action: that, after March 2019, de Palma assumed authority to direct Kenny to write on certain topics, thus diminishing her responsibilities. *See* Opp. at 3 (citing Klassen Decl., Ex. 17); *see* Kenny Dep. at 106. *But see* de Palma Dep. at 108 ("I can't assign her work.").

"told" or "asked" her to write a story for the news section "rephras[ing] the content" of an earlier

blog post she had written under a "different title"); Jasper Decl., Ex. C (same).  To the extent

Kenny claims that de Palma ran the meetings where news article topics were selected, his

involvement in selecting news article topics could not have infringed on Kenny's control over

her own content, given that she did not write such articles.  *See* Kenny Dep. at 116 (testifying

about photo of de Palma running meeting "in which he is asking staff to come up with ideas for

four stories that we will put on the website"); Klassen Decl., Ex. 16.

For these reasons, Kenny has not adduced evidence of an adverse employment action

sufficient to state a *prima facie* case for discrimination under Title VII.[13]

***Kenny's claim of a constructive discharge***:  Kenny alternatively claims that she was

constructively discharged.  It is undisputed that Kenny, who resigned with four weeks' notice,

was not actually terminated.  JSF ¶ 35 (email giving notice).  Rather, Kenny argues that

defendants constructively discharged her by creating "a work environment that was so

intolerable" that "[she] had no choice but to resign from her employment."  AC ¶¶ 84–85.  "A

---

[13] Although Kenny does not develop this point, she appears to claim to have experienced an
adverse employment action because defendants generally subjected her to increased supervision.
*See* Opp. at 2–3.  Were this treated as a distinct ground, it would not be basis on which to find an
adverse employment action.  Kenny attests that Costiglio targeted her for a "boot camp," Klassen
Decl., Ex. 19, and that Davis, a recent college graduate, harassed her by editing her work and
introducing errors, Kenny Dep. at 143.  But "excessive scrutiny without a tangible negative
consequence to the employee does not give rise to the level of an adverse employment action."
*Nidzon v. Konica Miolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 350 (S.D.N.Y. 2010); *see,
e.g.*, *Mabry*, 769 F. Supp. 2d at 393 (no adverse action where plaintiff, age 45, was subject to a
six-week period of supervision by supervisor under 40).  And as to the boot camp, the evidence
is that Kenny herself initially requested the boot camp, Klassen Decl., Ex. 20 ("I appreciate your
agreeing . . . to my earlier requests that our staff meet" to discuss "implement[ing] best
practices" and discussing timing "for this 'boot camp'"), that she thereafter refused to attend, *see*
Klassen Decl., Ex. 19 ("I cannot attend the boot camp meeting. . . ."), and that the boot camp
may not ultimately have occurred, Kenny Dep. at 93–94.

'discharge,' in satisfaction of the third element of the *prima facie* case, may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993). To establish a constructive discharge, an employee must show "both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that [s]he would have felt compelled to resign." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017) (quoting *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014)). Kenny, however, has not adduced evidence that meets "the high standard to establish that she was constructively discharged." *Black v. Buffalo Meat Serv., Inc.*, No. 21-1468, 2022 WL 2902693, at *2 (2d Cir. July 22, 2022) (quoting *Shultz*, 867 F.3d at 308).

Here, Kenny argues that defendants constructively discharged her by (1) denying her grievance, *see* Opp. at 5; AC ¶ 83; (2) subjecting her to supervision by younger and less experienced males, AC ¶ 83; and (3) "tr[ying] to make her attend a bootcamp no other employees had to attend even though she had by far the most writing experience," Opp. at 6. She further relies on her testimony that her colleagues avoided and ostracized her, that Costiglio ignored her, and that Sullivan was rude to her and "openly showed his hostility toward women by objectifying them." *Id.* Crediting Kenny's factual testimony as the Court must on this motion, the circumstances to which she points, whether considered together or separately, do not support a claim of constructive discharge.

As to Kenny's grievance, Jasper, on behalf of Catholic Charities, determined after an investigation that Kenny had *not* been subject to a demotion, disparate treatment, retaliation, or a

hostile work environment, and that her work had not been plagiarized.[14]  Kenny's disagreement

with this determination does not make out a constructive discharge claim.  *See* Opp. at 5–6;

Klassen Decl., Ex. 25 (May 14, 2019 letter denying grievance).  Kenny spins this letter as

"indicat[ing] that [defendants] did not intend to remedy their discrimination and wanted [Kenny]

to resign," Opp. at 6, but the letter does not say anything of the sort, Jasper Decl., Ex. E.  And

Kenny has not adduced any evidence that the subject of her resignation was ever discussed, let

alone raised by defendants.  *See* Opp. at 6.

Kenny instead relies on her subjective interpretation of the denial of her grievance as

"mean[ing] that the increasing retaliation and abuse that I had been experiencing was going to

continue, likely increase."  Opp. at 5–6; Kenny Dep. at 127.  But that theory would entitle any

employee whose grievance was rejected to spin the denial as errant and as betokening future

mistreatment.  The law is to the contrary.  *Cf. Holcomb*, 521 F.3d at 137 ("[A] plaintiff must

provide more than conclusory allegations to resist a motion for summary judgment.").  Kenny is

entitled to her own perspective on the merits of her grievance, but she has cited neither a factual

nor a legal basis to treat the denial of the grievance as signaling an intent to force her discharge.

Kenny relatedly asserts that Costiglio and Jasper instructed Kenny to write a news article

that de Palma had requested, reversing Jasper's instruction not to do so until the investigation of

the grievance was complete.  This series of events, Kenny argues, means that defendants had

prejudged her grievance.  *See* Opp. at 6 (citing Klassen Decl., Ex. 17; Kenny Dep. at 109).  But

even if Costiglio and Jasper's instruction is read as a reversal—as depicted by Kenny—without

more, it cannot be read to rise to the level of a deliberate action intended to create intolerable

---

[14] Kenny Dep. at 84–85 (claiming that de Palma plagiarized by summarizing her blog posts and
putting new titles on them for the news section).

workplace conditions, as required to make out a constructive discharge.  *See*, *e.g.*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73–74 (2d Cir. 2000) (no constructive discharge where internal investigator told plaintiffs that if conduct did not stop, they might have to leave, and trivialized plaintiffs' concerns; "ineffective or even incompetent" investigations do not, absent more, "rise to the level of deliberate action required" for constructive discharge); *see also Petyan v. N.Y.C. L. Dep't*, No. 14 Civ. 1434 (GBD) (JLC), 2015 WL 1855961, at *9 (S.D.N.Y. Apr. 23, 2015), *report and recommendation adopted*, 2015 WL 4104841 (S.D.N.Y. July 2, 2015) (negative performance evaluations, close supervision, adjustments to compressed time schedule, denial of vacation requests, assignment to less important tasks, and "superficial" investigation of EEOC complaint did not allege adverse employment action); *Day v. City of New York*, No. 15 Civ. 4399 (GBD) (HBP), 2015 WL 10530081, at *8 & n.8 (S.D.N.Y. Nov. 30, 2015), *report and recommendation adopted*, 2016 WL 1171584 (S.D.N.Y. Mar. 22, 2016) (failure to follow internal procedures and adequately investigate complaint not an adverse employment action). And the undisputed evidence of the events surrounding the grievance does not suggest an attempt to send a message to Kenny to quit.  On the contrary, after the grievance was filed, Jasper promptly initiated an investigation, conferred with Costiglio and Strk, met with Kenny multiple times, JSF ¶¶ 29–33, and admonished Costiglio not to write up Kenny for refusing to complete certain tasks out of concern that such could be appear retaliatory, *see* Jasper Dep. at 170.

Kenny next points to de Palma and Davis's increased editorial influence on her work and the suggestion of a bootcamp.  These too cannot support a claim of constructive discharge.  As reviewed above, the change in editorial responsibilities in the wake of website redesign, far from representing a sea-change, was one of degree rather than kind.  And Kenny did not participate in the bootcamp or experience repercussions for not doing so.  *See* Kenny Dep. at 93.  Kenny's

discontent with her employer's prerogatives does not support a claim of a constructive discharge, which "cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, . . . or preferred not to continue working for that employer." *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 525 (S.D.N.Y. 2015) (quoting *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)) (no constructive discharge where performance improvement plan provided "a roadmap for [plaintiff] to succeed in his position"). And "[a] constructive discharge generally cannot be established, . . . simply through evidence that an employee was dissatisfied with the nature of his assignments . . . [or because] the employee feels that the quality of [her] work has been unfairly criticized." *Stetson*, 995 F.3d at 360 (employee dissatisfied with assignments, criticisms of his work, and his compensation did not experience constructive discharge, especially where supervisor had never reduced plaintiff's salary, nor suggested plaintiff should retire).

Kenny next points to others' ostensible ostracism of, and Costiglio and Sullivan's ostensible rudeness to, her. On the evidence adduced, these circumstances, however unpleasant, fall well short of creating conditions so "intolerable" as to force a reasonable employee to resign. A constructive discharge requires more than "merely [that] the employee's working conditions were difficult or unpleasant." *Gorman*, 146 F. Supp. 3d at 525 (quoting *Spence*, 995 F.2d at 1156). It does not apply where the "gravamen" of the plaintiff's account concerns "conduct that amounts to nothing more than workplace dynamics—that is, personal enmity or personality conflicts." *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 Civ. 7584 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011), *aff'd*, 488 F. App'x 530 (2d Cir. 2012). That Kenny's coworkers stopped eating lunch or walking to the train with her, or were less friendly to

her, are likewise ones that fall short of compelling a reasonable employee to resign.[15]  And as to

rudeness she claims to have experienced from Costiglio and Sullivan, the "law does not require

an employer to like his employees, or to conduct himself in a mature or professional manner, or

unfortunately, even to behave reasonably and justly when he is peeved," *id.*, and rudeness is not

a basis to infer a constructive discharge.  *Compare* Kenny Dep. at 139–40 (Sullivan would

"start[] rolling his eyes at [her]" when she spoke and "speaking aggressively toward [her],"

"regularly cut[ting her] off when [she] spoke," and "basically act[ing] like what [she] had to say

was totally ignorant."), *with Gorman*, 146 F. Supp. 3d at 526–27 (anti-veteran statements,

supervisor's aggressive manner of addressing plaintiff, and hostile manner in which another

supervisor conducted weekly telephone conferences with plaintiff did not rise to level of hostile

work environment claim); *Buffalo Meat Serv., Inc.*, 2022 WL 2902693, at *2 ("The standard for

a constructive discharge claim 'is higher than the standard for establishing a hostile work

environment.'").

The evidence therefore does not support the Title VII element of an adverse employment

action.[16]

---

[15] De Palma's account of a lunch-time incident, although not necessary to this decision, supports
viewing Kenny as having experienced quotidian office tensions, as opposed to pressure to resign.
De Palma testified that Kenny "yelled really loud in the cafeteria that [de Palma was] a Trump
supporter and [he] believe[d] in anti-immigration . . . and then slammed her tray down with all
her food" in front of "a hundred people in the cafeteria" in a way that was "quite embarrassing
for him," and "really unsettling and uncalled for," de Palma Dep. at 143–44, 146.  Thereafter,
Kenny "stopped talking to everybody" and if de Palma, Davis, Strk, and Gomez were in a group,
"she would just walk by [them]" and "wouldn't even acknowledge [them]," *id.* at 218; s*ee also
id.* ("I said good morning to her every day and she didn't respond.  She just kept walking.").
Kenny does not discuss—or dispute—this account.

[16] Although the Court need not rely on the later elements of a Title VII discrimination claim in
light of its finding that the evidence does not support that of an adverse employment action, had

B.      Title VII:  Hostile Work Environment

Kenny separately claims to have experienced a hostile work environment based on

gender.

---

Kenny adduced sufficient evidence of such an action, the evidence did not establish these other elements, either.

First, the evidence does not support an inference of gender discrimination based on a showing of disparate treatment—the means of proving such discrimination that Kenny embraces here.  *See Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 584 (S.D.N.Y. 2012); *see also Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (evidence to support discriminatory inference may consist of direct or indirect evidence, with the latter category including such things as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action]"); *Champion v. N.Y.C. State Off. of Parks, Recreation & Hist. Pres.*, 500 F. Supp. 3d 26, 38 (S.D.N.Y. 2020).  None of the male co-workers to whom Kenny points "w[as] similarly situated [to her] in all material respects," so as to permit the inference that the employment action resulted from discrimination based on a protected characteristic. *Littlejohn*, 795 F. 3d at 312 (citation omitted)*.*  Davis and de Palma each made significantly less than Kenny, JSF ¶ 38; held different positions with different responsibilities, *id.* ¶¶ 16–18; and, unlike Kenny, were full-time employees, Pl. 56.1 ¶ 64; *see Lioi*, 914 F. Supp. 2d at 584–85 (co-workers improper comparators where they made significantly different salaries, and one was a computer specialist, and plaintiff was an associate staff analyst).

Second, assuming Kenny had made out a *prima facie* case of gender discrimination, defendants have come forward with evidence of nondiscriminatory reasons for the Marketing Department's reorganization and the concomitant modifications of Kenny's and her colleagues' responsibilities.  *See Holcomb*, 521 F.3d at 141 (standard).  These include the department's transition from blog posts to "harder-hitting content" that was "more news-like," de Palma Dep. at 110–14, which included a web redesign in late 2018 and early 2019 and related "styling change[]" from "soft content" to "clickbait" that required an intensified focus on post optimization work, *see id.* at 109.  These strategic shifts resulted in changes in workflow, *see, e.g.*, *id.* at 45 (discussing changes in roles after he was hired "[a]s we got more into optimizing the website"), and increased work for all department members, *see, e.g.*, Sullivan Dep. at 166–67 ("A:  [W]e were expanding the work of the communications/marketing department . . . there was more activity there. . . . The whole department was growing and taking on some new—some new projects."); *see also* de Palma Dep. at 47–48, 108 (news articles became part of strategy after homepage redesign).  Kenny has not adduced any evidence that these reasons were pretextual.

For such a Title VII claim to survive summary judgment, "a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Whidbee*, 223 F.3d at 69; *see also Penn. State Police v. Suders*, 542 U.S. 129, 146–47 (2004). The "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (citation omitted).  In evaluating hostile work environment claims, courts must consider the totality of the circumstances.[17] *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 388 (S.D.N.Y. 2002) (internal quotation marks omitted).

Here, Kenny's claim is that Sullivan cultivated an environment where women were judged "based on their youth and beauty rather than their accomplishments."  Opp. at 15.  In support, Kenny cites Sullivan's workplace statements about Beyoncé and J-Lo's stage attire; Sullivan's ostensibly preferential treatment of younger women, including Gomez, as supported by his executive secretary's statement that Gomez was Sullivan's "flavor of the month" and his

---

[17] In her deposition, Kenny testified that Davis and de Palma harassed her by plagiarizing her work.  *See* Kenny Dep. at 143 ("Q:  How did Zachary Davis harass you?  A:  Zachary Davis was one year out of college, and he was editing my work and inserting incorrect edits into my work and plagiarisms into my work, which I consider harassment.").  In opposing summary judgment, however, she does not rely on this testimony, substantiate that plagiarism occurred, or cite apposite case law as to why plagiarism or incorrect editing, if established, would support a claim of a gender-based hostile work environment.  And defendants have adduced evidence refuting that the work product adapted by her colleagues belonged to Kenny so as even potentially to support a claim of plagiarism.  *See* Jasper Decl., Ex. A at 49 (Handbook providing, in relevant part, that "[a]ll written work product, as well as research with its documentation and processes created or performed by employees in the regular course of duties are the sole property of the Agency"); JSF ¶ 22 (same).  The Court accordingly disregards this testimony.

having taken Gomez on a trip to Central America[18]; and the Beyoncé cutout in Sullivan's office.[19]  *See* Opp. at 14–18.  Kenny also cites Sullivan's purported rudeness to her.  *See, e.g.*, Kenny Dep. at 139.

Even viewing this behavior collectively and in the light most favorable to Kenny, Sullivan's conduct does not make out a Title VII hostile work environment claim.  Courts evaluating such claims must "distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment," while considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Gorman*, 146 F. Supp. 3d at 527 (internal quotation marks and citation omitted).  Sullivan's conduct here, however inappropriate or juvenile aspects of it may have been, falls into the category of offensive and boorish, but not actionable, behavior, as analyzed by the assembled case law.

---

[18] Defendants adduced evidence that Gomez was selected to go to Central America for reasons independent of her appearance: because "of her position as social media manager and expertise" and the need to "publicize the trip through social media."  Sullivan Dep. at 210.  They note that the other woman on the trip, Luz Tavarez, worked in government relations and would "manage the relationship between elected officials and Catholic Charities."  de Palma Dep. at 283; *see also* Sullivan Dep. at 212 (Tavarez coordinated trip and made all arrangements with local officials).  For purposes of this motion, the Court nonetheless assumes *arguendo* that a jury could conclude that Sullivan brought Gomez for the reasons Kenny theorizes.  *See* Pl. 56.1 ¶ 78; Opp. at 12.

[19] Defendants argue that Sullivan's conduct with respect to the Beyoncé cutout cannot be considered on the hostile work environment claim because Sullivan last displayed it in early 2018, whereas Kenny filed her EEOC charge on April 30, 2019.  Mem. at 22.  That is wrong. Kenny's claim of a hostile work environment is properly viewed holistically; it is permissible to argue that the environment she experienced in 2019 was informed by events in 2018.  In any event, it is disputed when the Beyoncé cutout was taken down.  Although defendants asserted that it was taken down in April 2018, *see* Def. 56.1 ¶ 84, Kenny testified that it was displayed through April 30, 2019, *see* Kenny Dep. at 144–46.

Addressing each category of conduct in turn:

Kenny first notes Sullivan's workplace references to Beyoncé and J-Lo's "scant" stage attire.  *See* Kenny Dep. at 138–39 ("[Y]ears ago" "a group of [Catholic Charities' employees] would all each lunch in the conference room" and Sullivan would "sit at the head of the table, . . . conduct the conversation," and "bring the conversation back to [Beyoncé and J-Lo] again and again")  But measured against Title VII precedents in this area, these remarks were neither pervasive nor severe.  *See* Kenny Dep. at 139–40 (lunches occurred "years ago" and Kenny interacted with Sullivan "very rarely" by 2019); *see, e.g.*, *Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108, 110 (2d Cir. 2007) (no hostile work environment where supervisor referred to "office bitches" and "Brooklyn bimbettes" and coworkers made sexually suggestive comments); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012) ("[V]ulgar banter, tinged with sexual innuendo," insufficient); *cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citation omitted)); *Wilson v. N.Y.P. Holdings, Inc.*, No. 05 Civ. 10355 (LTS) (DFE), 2009 WL 873206, at *28 (S.D.N.Y. Mar. 31, 2009) (comments that training females is like "training dogs," that "women need to be horsewhipped," and references to black female celebrities as "whores" and "sluts" were "mere offensive utterances" and did not create a hostile work environment).

Kenny next notes that Sullivan spent an inordinate amount of time with Gomez and that his executive secretary termed Gomez his "flavor of the month."  Kenny interprets this latter remark to refer to a younger woman to whom Sullivan briefly paid special attention.  *But see* Jasper Dep. at 219–22 (describing female and male "flavors of the month").  But this conduct, which Kenny argues reflects Sullivan's "objectifying" of women employees, also falls short of

the Title VII standard.  *See, e.g.*, *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 514–15

(S.D.N.Y. 2010) (no hostile work environment where male plaintiff alleged supervisors

encouraged viewing women as "sexual playthings" by calling women "chick[ies]," showing

favoritism toward women employees, and pressuring male subordinates to go to strip clubs); *cf.*

*Rossbach v. Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 930710, at *6 (S.D.N.Y.

Mar. 11, 2021) (no hostile work environment where female supervisor ridiculed, mocked, and

cursed female plaintiff, after male supervisor focused sexual attention on female plaintiff); *see*

*also Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir.

2013) ("Our Circuit has long since rejected 'paramour preference' claims, which depend on the

proposition that the phrase 'discrimination on the basis of sex' encompasses disparate treatment

premised not on one's gender, but rather on a romantic relationship between an employer and a

person preferentially [treated]." (internal quotation marks omitted)); *see also id.* at 16 (female

plaintiff's allegations of favoritism toward other female employees alleged "[n]othing . . .

indicat[ing] that there was discrimination against anyone on the basis of sex").

 Kenny next notes the fact of the Beyoncé cutout displayed by Sullivan.  On a proper

factual showing, obscene photographs and sexually offensive remarks can support a gender-

based hostile work environment claim.  But the display here, even alongside Sullivan's

occasional references to Beyoncé and J-Lo, again falls well short of the standards set by the

substantial case law in this area.  *See, e.g.*, *Redd*, 678 F.3d at 177; *Durant v. A.C.S. State & Loc.*

*Sols. Inc.*, 460 F. Supp. 2d 492, 498 (S.D.N.Y. 2006) (no reasonable jury could find hostile work

environment from two notes from supervisor that contained sexual propositions, but were not

physically intimidating); *Alter v. Rocky Point Sch. Dist.*, No. 13 Civ. 1100 (JMA) (AKT), 2017

WL 10409996, at *12 (E.D.N.Y. Jan. 12, 2017) (no hostile work environment where supervisor

made inappropriate comments concerning a "pelvic exam" in response to plaintiff's personal questions about an incoming assistant superintendent, sexual comments concerning school principal and another woman, and a comment referencing homosexuality); *Garcia v. N.Y.C. Health & Hosps. Corp.*, No. 19 Civ. 997 (PAE), 2019 WL 6878729, at *7 (S.D.N.Y. Dec. 17, 2019) (no hostile work environment where supervisor yelled at plaintiff multiple times and called him a homophobic slur).

Salient, too, is that Kenny has not adduced evidence that Sullivan intimidated or threatened her.  Indeed, as alleged by Kenny, the only behavior directed at Kenny consisted of rudeness or discourtesy.  *See, e.g.*, Kenny Dep. at 139–40 (Sullivan rolled his eyes when Kenny spoke, interrupted her, and was disrespectful).  But a supervisor's rudeness to an employee does not equate to a hostile work environment under Title VII.  *See Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (internal quotation marks omitted) ("Title VII is not a general civility code but rather forbids only behavior so objectively offensive as to alter the conditions of the victim's employment."); *see, e.g.*, *Mathirampuzha*, 548 F.3d at 73, 79 (incident where plaintiff's supervisor "grabbed the plaintiff's arm, punched him in the shoulder and chest, spit in his face, and poked him in the eye" and "shouted" at him was "not so severe as to alter materially the plaintiff's working conditions"); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (no hostile work environment where "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Littlejohn*, 795 F.3d at 321 (allegations that employer made negative statements about plaintiff, was impatient and used harsh tones, distanced herself and declined to meet with plaintiff, required plaintiff to recreate work, wrongfully reprimanded plaintiff, increased plaintiff's

schedule, and was sarcastic to plaintiff insufficient to support severe or pervasive hostile work environment); *Shultz*, 867 F.3d at 308–09 ("uncomfortable incidents" taken together, were not sufficiently pervasive to raise a triable issue of fact as to hostile work environment where superior disparaged pregnant plaintiff on a phone call, her name was removed from wall and newsletter, and colleagues did not speak to her).[20]

Viewing these circumstances in combination, Sullivan's conduct was not sufficient to "alter the conditions of [plaintiff's] employment and create an abusive working environment," as is required to violate Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see, e.g.*, *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (derogatory language from supervisor, dismissive comments from management, and intense scrutiny of plaintiff together "insufficiently severe and pervasive" to create hostile work environment); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, at *1, *8–9 (S.D.N.Y. Apr. 3, 2009) (no hostile work environment where supervisor ignored and spoke to plaintiff harshly at meetings; scolded her; threatened to transfer her to another department; denied transfer to supervisor of her choice; gave her extra duties; stripped her of other duties; referred to her as "black ass" on three occasions; closely monitored her; gave unrealistic time periods to complete tasks; eliminated programs that plaintiff had implemented; and ultimately terminated plaintiff and replaced her with a white female), *aff'd*, 372 F. App'x 137, 139–40 (2d Cir. 2010); *Davis-Molinia*, 2011 WL 4000997, at *11 ("diminished [job] responsibilities,"

---

[20] *See also Williams*, 154 F. Supp. 2d at 825 (collecting cases); *Gregory v. Daly*, 243 F.3d 687, 694 (2d Cir. 2001), *as amended* (Apr. 20, 2001) (hostile work environment where supervisor made specific references to women as easy victims of sexual assault, made sexually demeaning statements, initiated unwelcome physical conduct of a sexual nature, intimidated plaintiff by standing uncomfortably close to her and refusing to move away when she requested as much, and would go into plaintiff's office and yell sexually explicit things at her).

"exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, not enough to show that defendants' conduct was sufficiently severe or pervasive), *aff'd*, 488 F. App'x 530, 531–32 (2d Cir. 2012).

Summary judgment, therefore, is also warranted for defendants on Kenny's Title VII hostile work environment claim.[21]

### C.  Title VII: Retaliation

Kenny also brings claims of retaliation.  She claims that Catholic Charities retaliated for her August 2016 complaints (joined in by other women) about Frederick Joseph and Costiglio's supervision of Joseph, by offering her lessened job duties, excluding her from galas and parties, and moving her to a smaller desk in a less desirable location.  And she claims that Catholic Charities retaliated for her March 2019 grievance by constructively discharging her, ostracizing or ignoring her, and demoting her.  *See* Opp. at 22–23.  Defendants respond that the alleged acts of retaliation fall short of being reasonably likely to deter a person from engaging in the protected activity, that Kenny cannot establish a causal connection between complaints and these acts, and that Kenny's claims are time-barred with respect to alleged retaliation before July 4, 2018.  Mem. at 18–23.  As to the final point, Kenny counters that her claims are timely under the continuing violation doctrine.  Opp. at 23–24.

---

[21] Kenny relatedly appears also to argue that a hostile work environment constructively forced her discharge. *See Penn. State Police*, 524 U.S. at 146–47.  A plaintiff who so claims "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 147.  This standard describes conduct "*graver* . . . than its lesser included component, hostile work environment." *Id.* at 149.  With the Court's having found the evidence insufficient to establish a hostile work environment, it follows that it is also insufficient to support a claim of constructive discharge on account of such an environment.

Title VII retaliation claims are also subject to the *McDonnell Douglas* framework. *See Philip v. Gtech Corp.*, No. 15 Civ. 9261 (PAE), 2016 WL 3959729, at *10 (S.D.N.Y. July 20, 2016). To state a *prima facie* case of retaliation, a plaintiff must establish that: (1) she participated in a protected activity; (2) her protected activity was known to her employer; (3) the employer thereafter subjected her to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). "An adverse employment action that may not be discriminatory may still be retaliatory, and therefore unlawful." *Goldson v. Kral*, No. 13 Civ. 2747 (GB) (DFM), 2016 WL 1241526, at *6 (S.D.N.Y. Mar. 24, 2016).

The evidence Kenny has adduced satisfies the first and second prongs of this test: Her internal complaints were a protected activity under Title VII, and the parties do not dispute that defendants knew of her complaints. *See McKenna v. Santander Inv. Sec., Inc.*, No. 21 Civ. 941 (DLC), 2022 WL 2986588, at *10 (S.D.N.Y. July 28, 2022) ("Protected activity need not consist of a formal complaint of discrimination; an 'internal complaint to company management' can constitute a protected activity under Title VII."); Pl. 56.1 ¶ 25 (not disputing date of first grievance); JSF ¶ 29 (second grievance).

However, to the extent that Kenny alleges conduct in retaliation for her 2016 complaint about Joseph, Kenny's retaliation claim is time-barred. "Generally, each discrete discriminatory or retaliatory act that violates federal law 'gives rise to a freestanding [federal] claim with its own filing deadline.'" *McKenna*, 2022 WL 2986588, at *6 (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012)). "Where, as here, a plaintiff complains of a discrete act or series of discrete acts, each of which violates the law, the plaintiff has a separate claim for each act, and each act carries its own limitations period." *Gonzalez v. Hasty*, 802 F.3d

45

212, 223 (2d Cir. 2015).  "Therefore, where a plaintiff's claims are premised on discrete

discriminatory or retaliatory acts such as termination, failure to promote, denial of transfer, or

refusal to hire, those claims may be barred by the statute of limitations if they occurred prior to

the 300-day period even though they may be related to acts that occurred within the permissible

300-day period."  *McKenna*, 2022 WL 2986588, at *6 (internal quotation marks omitted).

Here, Kenny filed her EEOC complaint on April 30, 2019.  Dkt. 62, Ex. A.  It follows

that all her federal claims arising from alleged discrete retaliatory acts occurring before July 4,

2018—300 days before she filed her complaint with the EEOC—are time-barred.  *See, e.g.*, *Cruz

v. City of New York*, No. 21 Civ. 1999 (DLC), 2021 WL 5605139, at *5 (S.D.N.Y. Nov. 30,

2021).

The three areas of conduct Kenny terms retaliation for her 2016 complaints relating to

Joseph all occurred before July 4, 2018.  The allegedly insulting job description was offered to

Kenny in late 2016.  *See* Kenny Dep. at 39.  Kenny was temporarily placed at a less desirable

desk in January 2017, Pl. Opp. at 21; *see* Kenny Dep. at 153 (she was placed at a small desk for

more than one week, but less than one month); this act, in any event is too trifling alone to

support a claim of retaliation.  *See Bloomberg L.P.*, 967 F. Supp. 2d at 847 (even if not time-

barred, failure to give plaintiff a desk and phone immediately upon her return from maternity

leave did not give rise to an inference of retaliation under Title VII); *Klein v. N.Y. Univ.*, 786 F.

Supp. 2d 830, 849 (S.D.N.Y. 2011) (no materially adverse action where plaintiff assigned to

worse office "because there is no evidence [she] was injured or harmed by not receiving better

lighting or improved views").  Finally, as to Kenny's alleged exclusion from Catholic Charities'

fundraising galas—which Kenny suggests employees were not entitled to attend but to which

higher-ups sometimes invited them, *see* Kenny Dep. at 113–14—this conduct is undated; Kenny

has not identified a specific instance of this conduct occurring after July 4, 2018.  In any event, such an exclusion from social events, like a temporary desk placement, is not significant enough to dissuade "a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see, e.g.*, *id.* at 69 ("A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight."); *Mabry*, 769 F. Supp. 2d at 399 (no hostile work environment where plaintiff excluded from management meetings); *cf. Davis-Molinia*, 2011 WL 4000997, at *11 (no hostile work environment where, *inter alia*, coworkers were "cliquish" and excluded plaintiff from "get togethers" and restaurant dinners).

Kenny's attempt to make this conduct timely by invoking the continuing violation doctrine fails.  That doctrine requires a plaintiff to adduce evidence "establish[ing] the existence of a discriminatory policy or mechanism."  *Lukasiewicz-Kruk v. Greenpoint YMCA*, 404 F. App'x 519, 520 (2d Cir. 2010), *cert. denied*, 564 U.S. 1023 (2011).  Kenny has not done so here. Instead, her retaliation claim is anchored in discrete incidents or practices pre-dating July 4, 2018.  *See, e.g.*, *Rajcoomar v. Bd. of Educ.*, No. 16 Civ. 1682 (VB), 2017 WL 980616, at *7 (S.D.N.Y. Mar. 13, 2017) (no continuing violation because theory that various individuals retaliated against plaintiff for threatening to sue for prior discrimination did not amount to discriminatory policy); *cf. Troeger v. Ellenville Cent. Sch. Dist.*, 523 F. App'x 848, 851–52 (2d Cir. 2013) (plaintiff could not file untimely claim by claiming that failure to accommodate "continued" or defendant engaged in similar unlawful actions during statutory period).

As to the acts of retaliation in response to Kenny's 2019 grievance, the evidence is insufficient to establish the third or fourth prongs of a *prima facie* case.

As to the third prong, although the requirement for an adverse action in connection with a claim for retaliation "covers a broader range of conduct than does the adverse-action standard for claims of discrimination," *Vega*, 801 F.3d at 90 (internal quotation marks omitted), the conduct must still be such that, viewed in context, it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  "When considering whether the alleged acts of retaliation rise to the level of material adversity, a court must consider the actions "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."  *Alter*, 2017 WL 10409996, at *12 (citation omitted).  But "trivial harms"—that is, "those petty slights or minor annoyances that often take place at work and that all employees experience"—are not materially adverse.  *Id.*

Kenny has not adduced evidence meeting that standard.  To begin, the heart of the allegedly retaliatory conduct she alleges—the assignment of new editorial responsibilities, and the elimination of earlier authority, as announced in the March 2019 email—occurred *before* Kenny filed her March 25, 2019 grievance.  It therefore could not have been retaliation for that grievance.  *Compare* JSF ¶ 27 (Costiglio email to Kenny on March 14, 2019), *with id.* ¶ 29 (grievance submitted to Human Resources on March 25, 2019).  And such conduct occurred so long in time (27 months later) after the August 2016 complaint about Joseph as not to give rise to any retaliatory inference.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (when mere temporal proximity offered as evidence of causality, timing of conduct must be "very close"; action taken 20 months later suggests no causality); *see, e.g.*, *Smiley v. Cassano*, No. 10 Civ. 3866 (RJS), 2012 WL 967436, at *8 (S.D.N.Y. Mar. 21, 2012) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the

protected activity and the adverse employment action does not allow for an inference of causation." (citation omitted)).

A reasonable finder of fact could not find the remaining ostensibly retaliatory conduct to rise to the level of an adverse action.  Kenny attested that Costiglio was "increasingly rude" and refused to talk to her, *see* Kenny Dep. at 166 ("[H]e spoke to me as little as possible I should say."), and that other colleagues in the Marketing Department ostracized her, *see* Opp. at 22; Kenny Dep. at 164.  But, however unpleasant, a supervisor's rudeness is a petty slight, not a materially adverse action.  *See, e.g.*, *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 n.3 (2d Cir. 1996) (supervisor's "occasional nastiness" not materially adverse action); *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 55 (2d Cir. 2018) (no retaliation where supervisor was rude to plaintiff in a meeting, spoke to her "oddly" about software changes, declined vacation days); *see also Alter*, 2017 WL 10409996, at *15 (claim of decreased interaction with supervisor not materially adverse action); *Bloomberg L.P.*, 967 F. Supp. 2d at 847–48 (no materially adverse action where senior management "ostracized" plaintiff after she became pregnant by ignoring her in the hallways, avoiding eye contact).  And even if it had post-dated her grievance, the modest modification of Kenny's editorial responsibilities fell far short of a demotion or constructive discharge.  A reasonable finder of fact would not have viewed these changes, attendant to Catholic Charities' website overhaul, as apt to deter the filing of a discrimination complaint.  *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (inconvenience or alteration of job responsibilities not materially adverse action); *Klein*, 786 F. Supp. 2d at 849 (no materially adverse action where plaintiff was not reassigned to better office, was given worse teaching schedule, and was denied housing requests were denied); *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 259

(S.D.N.Y. 2013), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (no retaliation where reassignment altered plaintiff's job responsibilities, but he was paid same salary); *Alter*, 2017 WL 10409996, at *14 (no materially adverse action where, although plaintiff's job responsibilities were changed, she retained her primary responsibilities, benefits, title, and clerical support, and received a raise).

Kenny thus has not adduced evidence making out a *prima facie* case of retaliation in violation of Title VII. The Court grants defendants' motion for summary judgment on that claim, as well.

### D.    NYSHRL and NYCHRL Claims

Kenny, as noted, brings gender and age discrimination, hostile work environment, and retaliation claims under the NYSHRL and NYCHRL. *See* AC at 17–22. These claims are before the Court solely pursuant to its exercise of supplemental jurisdiction given their relatedness to Kenny's federal-law claims under Title VII.[22]

---

[22] The AC conclusorily invokes diversity jurisdiction as an alternative basis for this case to be heard in federal court, but the facts alleged do not make out such jurisdiction. The AC does not allege the citizenship of the individual defendants or that the amount in controversy exceeds $75,000. *See* AC ¶ 9; Dkt. 30 ¶ 9 (defendants' answer denying AC's allegations as to jurisdiction, save as to federal question jurisdiction under Title VII); *see also* 28 U.S.C. § 1332; *cf.* Dkt. 1 ¶ 5 (initial Complaint, not alleging diversity jurisdiction). Nor has Kenny since alerted the Court to evidence establishing the prerequisites of diversity jurisdiction, whether as to citizenship or the amount in controversy. *See Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 64 (2d Cir. 2009) ("[W]here the facts necessary to the establishment of diversity jurisdiction are subsequently determined to have obtained all along, a federal court may . . . allow a complaint to be amended to assert those necessary facts," or, "when the record as a whole, as supplemented, establishes the existence of the requisite diversity of citizenship between the parties, [the Court] may simply 'deem the pleadings amended so as to properly allege diversity jurisdiction'") (internal citations omitted)). In light of this case's long history, Kenny's having utilized her opportunity to amend, and the multiple discovery extensions, the Court declines to interrogate the presence of diversity jurisdiction further. *Cf. Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 467–68 (2d Cir. 2011) (summary order) (dismissing where, after amendment, complaint did not allege diversity jurisdiction); *Platinum-Montaur Life Scis., LLC v. Navidea Biopharms., Inc.*, 943 F.3d 613, 617–

"District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims.").

The Court exercises its discretion to address and resolve Kenny's NYSHRL claims. Because "claims brought under [NYSHRL] are analytically identical to claims brought under Title VII," judicial economy, convenience, and fairness all strongly support resolving Kenny's claims under the NYSHRL to the extent that these parallel Kenny's Title VII claims.  Such is the case with respect to Kenny's NYSHRL claims based on gender discrimination, a gender-based hostile work environment, and retaliation.  *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011); *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020) ("Hostile work environment claims under Title VII and the NYSHRL are judged by the same standard."); *id.* at 330 (same, as to retaliation claims).  And although

18 (2d Cir. 2019) (district court has discretion to order jurisdictional discovery in a removal case with improperly pleaded citizenship).

Kenny's NYSHRL claims are broader than her Title VII claims to the extent that the former also allege age—or age-plus-sex—discrimination, these claims necessarily founder, too.  That is because a necessary element of these claims is an adverse employment action.  And, for the reasons stated above, the evidence, viewed in the light most favorable to Kenny, does not so establish such.[23]  Kenny's claims against the individual defendants under the NYSHRL that are formulated as ones of aiding and abetting—a theory unavailable under Title VII,  *see Farmer*, 473 F. Supp. 3d at 337—also fail.  Aiding and abetting "is only a viable theory where an underlying violation has taken place."  *Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) (summary order); *see Wilkerson v. Metro. Transp. Auth.*, No. 19 Civ. 9340 (LJL), 2021 WL 5761649, at *13 (S.D.N.Y. Dec. 3, 2021), *reconsideration denied*, 2022 WL 2191753 (S.D.N.Y. June 17, 2022); *see also Nicholson v. Staffing Auth.*, No. 10 Civ. 2332, 2011 WL 344101, at *2 (S.D.N.Y. Feb. 1, 2011) ("A predicate requirement of aider-and-abettor liability is a finding of primary liability as to the employer.").  Because a reasonable factfinder could not find a primary violation of the NYSHRL, Kenny's aiding and abetting claim under that

---

[23] Recent amendments to the NYSHRL are not relevant to this case.  As amended, the NYSHRL is now to be construed, like the NYCHRL, "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (citing N.Y. Exec. Law § 300).  The broadened statutory scope, among other things, removes the law's "severe and pervasive requirement" as to claims of a hostile work environment, imposing, instead, a "more lenient standard . . . similar to the standard for stating a hostile work environment claim under the NYCHRL." *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ. 02512 (CM), 2022 WL 524551, at *9 (S.D.N.Y. Feb. 22, 2022).  However, the amendment "is not retroactive." *Id.*  It applies only to claims that accrued after the amendment's effective date of October 11, 2019—long after Kenny had left Catholic Charities and the conduct relevant to the instant case had occurred. *See, e.g., Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) (amendments apply only to claims that accrued after effective date of October 11, 2019); *Mondelo*, 2022 WL 524551, at *9 (applying "severe and pervasive" standard to conduct that occurred prior to October 2019).

statute necessarily cannot stand.  *See, e.g.*, *Wilkerson*, 2021 WL 5761649, at *13; *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *7–8 (S.D.N.Y. Nov. 30, 2015) *Petrisch v. HSBC Bank USA, Inc.,* No. 07 Civ. 3303 (KAM) (JMA), 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013).

As to Kenny's NYCHRL claims, however, the Court declines to exercise supplemental jurisdiction.  The argument for not exercising supplemental jurisdiction following a decision to eliminate federal claims is particularly strong where the non-federal claims are governed by a different legal standard.  Such is clearly the case with respect to Kenny's NYCHRL claims, which must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  Given factors including the "slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims," *Bloomberg L.P.*, 967 F. Supp. 2d at 835, the independent inquiry the Court would need to undertake in this "evolv[ing]" area of law, *see id.* at 835 n.6, and the parties' limited briefing specific to the NYCHRL claims, the factors of convenience, comity and judicial economy strongly favor declining to exercise jurisdiction over Kenny's NYCHRL claims.  *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 37 (E.D.N.Y. 2015) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting summary judgment on federal claims); *Summit v. Equinox Holdings, Inc.*, No. 20 Civ. 4905 (PAE), 2022 WL 2872273, at *17–18 (S.D.N.Y. July 21, 2022) (same, as to NYSHRL and NYCHRL claims); *Triana v. Sodexo, Inc.*, No. 15 Civ. 5895 (RA), 2018 WL 6413151, at *8 (S.D.N.Y. Dec. 5, 2018) (same, as to NYSHRL claims); *Downey v. Adloox Inc.*, No. 16 Civ. 1689 (JMF), 2018 WL 5266875, at *9 (S.D.N.Y. Oct. 23, 2018) (same, as to NYCHRL claims).

Accordingly, the Court declines to exercise supplemental jurisdiction over Kenny's claims under the NYCHRL.  Kenny's claims under city law are all therefore dismissed, without prejudice to her right to re-file them in state court.

## CONCLUSION

For the foregoing reasons, the Court (1) grants summary judgment to the defense on Kenny's claims under Title VII and the NYSHRL, and (2) declines to exercise supplemental jurisdiction as to Kenny's claims under the NYCHRL, and dismisses these without prejudice to Kenny's right to pursue these claims in state court.

The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 14, 2023
New York, New York